UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**ANTONIO EADDY,**

                         Plaintiff,

        -against-

**UNITED STATES OF AMERICA,**

                    Defendants.

Case No.: 24-cv-8109

**AMENDED COMPLAINT**

Plaintiff ANTONIO EADDY, by his attorneys, Rickner PLLC and Cohen & Green PLLC, complaining of the Defendant, alleges, upon information and belief and personal knowledge:

### NATURE OF THE CASE

1.  Plaintiff brings this action for damages under the Federal Tort Claims Act ("FTCA") for personal injury and pain and suffering he suffered while detained by the Bureau of Prisons ("BOP") in the Manhattan Detention Center ("MDC") in Brooklyn, New York.

### JURISDICTION AND VENUE

2.  This action is brought pursuant to 42 U.S.C. § 1331, 28 U.S.C. § 1346(b), and 28 U.S.C. §§ 2761–80.

3.  Venue is proper under 28 U.S.C. § 1402(b) in the District Court for the Eastern District of New York, because the acts and omissions giving rise to Plaintiff's claims occurred within the Eastern District of New York.

4.  Prior to retaining undersigned counsel, Plaintiff filed a Form 95 regarding the instant claim, which was received by the Bureau of Prison's Northeast Regional Office on July 28, 2022.

5.  The Bureau of Prisons allegedly denied Plaintiff's claim on June 13, 2023, but Plaintiff did not receive this denial and was unaware of it.

1

6.   The Bureau of Prisons dated the letter June 13, 2023, and the letterhead states "Via Certified and Return Receipt Mail" but the letter does not have a tracking number on it or anything to confirm it was mailed on this day. In court, an attorney for the United States stated that they had a tracking number, but admitted that there was no evidence it was received at FCI Otisville. There is also no evidence it was received before Plaintiff left FCI Otisville on June 21, 2023.

7.   In his pro se Form 95, Plaintiff put his address on the form as his home address, where he returned to after his release on June 21, 2023. The Bureau of Prison, however, chose to send the denial letter to FCI Otisville, rather than Plaintiff's actual address.

8.   Once retaining counsel, Plaintiff properly served his claims on the Bureau of Prisons on May 6, 2024, as required by 28 U.S.C. §§ 2765(a).

9.   On May 30, 2024, Plaintiff received a response letter from BOP denying his claim, and this present Complaint is being filed within the six-month statute of limitations.

10.   Accordingly, Plaintiff has complied with all statutorily jurisdictional requirements and conditions precedent to commencement and prosecution of this litigation.

## PARTIES

11.   Plaintiff has been at all times relevant to this action, a resident of Kings County in the State of New York.

12.   Defendant United States of America is sued for personal injuries to Plaintiff caused by the wrongful or negligent acts or omission of Defendants' agents or employees, who were acting within the scope of the office or employment under circumstances where the United States of America, if a private person, would be liable to Plaintiff in accordance with the laws of the State of New York. *See* 28 U.S.C. § 1346(b).

## FACTUAL ALLEGATIONS

2

### a. *Mr. Eaddy's Wrongful Placement in SHU*

13.   On April 25, 2022, Mr. Eaddy was living in general population housing unit 52 when he was falsely accused of being involved in an altercation occurring with other inmates. As a result of this accusation, he was placed in the Special Housing Unit ("SHU") as punishment.

14.   Despite Mr. Eaddy's attempts to explain and prove his innocence, he was kept in SHU from April 25, 2022 through May 10, 2022.

15.   At some point while in SHU, an investigator with the Special Investigative Services ("SIS") unit came to speak with Mr. Eaddy about the altercation in which he had allegedly taken part. The investigator's first or last name is believed to be Ward.

16.   Mr. Eaddy reiterated to the investigator that he had not been involved whatsoever, and the investigator told Mr. Eaddy he would review the video footage. If the investigator could confirm Mr. Eaddy's story, he said Mr. Eaddy would be returned to housing unit 52, the housing unit that the unit manager had determined was the proper place for him.

### b. *The May 10, 2022 Incident*

17.   On May 10, 2022, Lt. Santucci, who is not the housing unit manager, came and informed Mr. Eaddy that he would not be returning to housing unit 52 and would instead be moving to Unit 51.

18.   Mr. Eaddy was concerned about being moved to unit 51, as it was known at the time to be a unit where gang members were housed and the unit was extremely dangerous. Gang members at MDC Brooklyn frequently assault other detainees. Unit 51 was known as a warzone, with regular fights. In Unit 52, Plaintiff was with his co-defendants, who could protect him. In Unit 51, Plaintiff could be targeted by the gangs because he was not a member of the gangs in that

unit, and the gangs are territorial and would attack incarcerated people who were not members of their gang. Plaintiff explained these concerns to Lt. Santucci.

19.    But when Mr. Eaddy concern over the dangers in unit 51, Lt. Santucci told him he could either go to unit 51 or stay in SHU, where he was starting to lose his mind from the isolation. Faced with this Hobson's choice, Mr. Eaddy chose the former.

20.    When Mr. Eaddy was being moved to unit 51, he saw a corrections officer from unit 52, who also expressed confusion regarding Mr. Eaddy's move—he stated that he thought Mr. Eaddy was coming back to unit 52, as his personal belongings were all still there, because the unit manager had never approved a move to unit 51.

21.    Around approximately 6:00–7:00 p.m., Mr. Eaddy was placed in a cell in unit 51 with a cellmate he did not know.

22.    Another incarcerated person who Mr. Eaddy did not know soon entered the cell and started peppering him with questions. While this person was asking Mr. Eaddy, his cellmate left the cell.

23.    Mr. Eaddy could see shadows moving behind him as he answered questions. Upon turning his head to see what was behind him, his cellmate attacked him. Multiple other incarcerated individuals, who had apparently been waiting just outside the cell, entered the cell and joined in on the brutal attack. One person stayed outside the closed cell door and kept watch. In total, there were approximately 5 to 10 incarcerated individuals involved in Mr. Eaddy's attack.

24.    At the time of the attack, Mr. Eaddy had a broken foot and was wearing a boot, which made it difficult for him to move around and defend himself.

25.    During the assault, Mr. Eaddy was slashed approximately four times by several of his attackers. The largest slash went from behind his ear and down the left side of his neck. The other

3 were by the top of his left earlobe, by his left temple, and on the left side of his face coming down towards his lip.

26.  His broken foot was also stepped on during the attack, causing it to swell. He also suffered a swollen eye from being hit by the assailants.

27.  For the entire duration of the attack, no corrections officer or other BOP staff member intervened.

28.  Mr. Eaddy saw blood all over his body and briefly blacked out. Upon regaining consciousness, Mr. Eaddy heard people around him saying, "He's dying, he's dying."

29.  As Mr. Eaddy stumbled down the housing block, blood spurting out of his neck, corrections officers stationed at the door to the unit saw him but did not immediately rush over. The officers told other incarcerated individuals to get back into their cells and buzzed Mr. Eaddy out of the housing unit and into the main hallway.

30.  As Mr. Eaddy came towards the door to the guards' station, a BOP nurse, whose name is believed to be Ortiz, saw him and rushed over. Although guards told her to "leave him," she refused.

31.  By this point, Mr. Eaddy was unable to stand due to weakness, pain, and blood loss. Mr. Eaddy, fearing he was at acute and immediate risk of bleeding to death, asked Nurse Ortiz if the neck wound was bad. She comforted him until an ambulance came. While he waited, several corrections officers gathered to take a photo of Mr. Eaddy's wounds. His several requests for water were denied.

32.  Once EMT's arrived, they put him on a stretcher and transported him to the NYU Langone Brooklyn Hospital emergency department where he received treatment, including stitches, for his injuries.

33. At the hospital, Mr. Eaddy learned that the wound in his neck was around six inches long, and that the slash had come extremely close to his main artery. A doctor also told him he could have died from blood loss from his injuries.

34. Upon discharge, Mr. Eaddy returned to MDC and was placed in SHU. When Antonio was placed back in the SHU, Lt. Santucci said, "you're lucky to be alive," with a chuckle, showing that he knew that he sent Plaintiff into a dangerous unit.

35. At first, he was placed in the West SHU, which was, upon information and belief, also housing the people who attacked Mr. Eaddy. He knew this because he could overhear them talking about what they had done to him.

36. Mr. Eaddy was not given any pain medicine or any other treatment for his injuries.

37. BOP staff at the MDC infirmary were supposed to check on the injury and remove the stitches, but they failed to do so in a timely manner—by the time medical personnel checked the wound, the stitches were already coming out on their own.

38. Mr. Eaddy was forced to stay in the SHU until October 12, 2022, or approximately 5 months.

39. To this day, the scar on Mr. Eaddy's neck is very visible. The scar tissue has discolored his skin and is very painful—Mr. Eaddy is no longer able to lay comfortably on the left side of his neck.

40. Mr. Eaddy also suffers from ongoing emotional and psychological distress from the severe trauma inflicted upon him due to this attack, including nightmares, paranoia, and suicidal ideation.

## CLAIM FOR RELIEF:
## NEGLIGENCE BY FEDERAL LAW ENFORCEMENT
## UNDER THE FEDERAL TORT CLAIMS ACT

41.  Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

42.  BOP staff have a duty to ensure pretrial inmates' safety and security.

43.  The Federal Bureau of Prisons Program Statement 7331.05 outlines rules, regulations, and procedures that must be followed when making housing decisions in order to ensure the safety and security of pretrial inmates.

44.  Specifically, within 48 hours of admission, an initial assessment must be completed, whereby BOP staff can seek information pertaining to an "inmate's behavior or offense severity, thereby helping to determine the inmate's security, medical, psychological, and/or other special needs." *See* 7331.05(7)(b).

45.  After this assessment is complete, BOP staff will make a recommendation for housing to the Unit Manager, the individual responsible for overseeing all unit programs and activities. *See* 7331.05(7)(b); *see also* Inmate Admission & Orientation Handbook, pg. 2.

46.  The regulations are clear that the decision regarding a pretrial inmate's housing assignment is made solely by the Unit Manager and cannot be delegated below the Unit Manager level without the Warden's written authorization, which must include specific regulations for any alternate method of assigning housing. *See* 7331.05(7). No such authorization was provided. And consequently, there was no discretion to allow housing assignments by anyone but the Unit Manager.

47.  The Unit Manager is not a rank, like a lieutenant or sergeant. Instead, it is the lead of the Unit Team. The Unit Team, also known as the Classification Team is responsible for housing

assignments. Beyond the Unit Manager, the Unit Team includes the Case Manager, Correctional Counselor, and Unit Secretary. The Staff Psychologist, Education Advisor and Unit Officer are also considered members of the Unit Team and provide input for classification purposes. *See* Inmate Admission & Orientation Handbook, pg. 2.

48. When the directives say that assignments cannot be delegated below the Unit Manager, it means that it cannot be delegated to another Unit Team member, not that higher ranking officers have any authority to independently handle housing assignments.

49. Finally, prior to any changes to an incarcerated individual's housing assignment, employees "must review the Bureau's Inmate Information System [("BIIS")] for information regarding possible separatees and other management concerns and document this review in the inmate's pretrial drop file folders." *See* 7331.05(8)(c).

50. Indeed, the Unit Managers are responsible for regular reviews of pretrial detainees, called the Program Review, and "[d]uring each inmate Program Review, the Unit Manager is responsible for reviewing work, programming, and ***housing unit assignments***." *See* 7331.05(1) (emphasis added).

51. The Unit Manager even remains the decision-maker for housing assignments after conviction. For regular cases, meaning cases where there are no special considerations, like public safety factors, "the Unit Team has authority to make custody assignments, and the Unit Manager is the signature authority on the BP-338," a housing assignment form. *See* P5100.08(D)(1). For other cases, the Warden must sign and approve the BP-338.

52. Mr. Eaddy suffered physical and psychological injuries as a result of the failure of BOP and its staff to follow their own policies and procedures.

53. Lt. Santucci improperly made the decision to move Mr. Eaddy into a new housing unit, despite his lack of status as a Unit Manager, or as a member of the Unit Team. Upon information and belief, he also failed to review Mr. Eaddy's BIIS information and document said review.

54. Had proper protocol been followed, Mr. Eaddy would not have been placed in a gang unit that was known to be dangerous, particularly for people who were not in the gang, like Mr. Eaddy. And if he had not been placed in unit 51, he would not have been attacked almost immediately on arrival.

55. By failing to follow these rules and regulations, and failing to protect Mr. Eaddy from known dangers, BOP staff breached their duty to ensure the safety and security of Mr. Eaddy, which directly led to his near-death assault.

56. As a result of this assault, Mr. Eaddy endured immense pain and suffering, and significant, permanent physical injury.

57. The United States is liable for these tortious acts under the Federal Tort Claims Act because they were committed by federal agents or employees who were acting within the scope of the office or employment, under circumstances where the United States of America, if a private person, would be liable to Plaintiff in accordance with the laws of the State of New York.

**WHEREFORE**, Plaintiff demands the following relief jointly and severally against all of Defendants:

    a.      Compensatory damages;

    b.      Punitive damages;

    c.      The convening and empaneling of a jury to consider the merits of the claims herein;

    d.      Costs and interest and attorney's fees;

    e.      Such other and further relief as this court may deem appropriate and

           equitable.

Dated: New York, New York
      April 8, 2025

Rickner PLLC

By: _____

14 Wall Street, Suite 1603
New York, New York 10005
Phone: (212) 300-6506
Fax: (888) 390-5401
*Attorney for Plaintiff*


**COHEN&GREEN P.L.L.C.**

By: _____
Elena L. Cohen
J. Remy Green
Jessica Massimi

1639 Centre Street, Suite 216
Ridgewood (Queens), NY 11385
t: (929) 888-9480
f: (929) 888-9457
e: elena@femmelaw.com
   remy@femmelaw.com
   jessica@femmelaw.com