

September 3, 2025

Alexandra Megaris
Assistant U.S. Attorney
Civil Division
Eastern District of New York
271-A Cadman Plaza East, 7th Floor
Brooklyn, New York 11201
Alexandra.Megaris@usdoj.gov

<u>By Electronic Mail</u>

**Re:**    *Eaddy v. United States of America,* 24-cv-8109  (RPK) (VMS)

Dear Counselor:

Pursuant to the Court's Scheduling Order dated August 21, 2025, enclosed please find the following related to Plaintiff's Opposition to Defendant's Motion to Dismiss the First Amended Complaint.

1. Plaintiff's Memorandum in Law in Opposition to Defendant's Motion to Dismiss;
2. Declaration of Elena L. Cohen and exhibits referenced therein; and
3. Certificate of Compliance Pursuant to Local Rule 7.1(c)

With regards,

/s/
_____
Elena L. Cohen
Cohen&Green P.L.L.C.
*Co-counsel for Plaintiff*
1639 Centre St., Suite 216
Ridgewood, New York 11385

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**ANTONIO EADDY,**

                    Plaintiff,

          -against-

**UNITED STATES OF AMERICA,**

                    Defendant.

Case No.: 24-cv-08109-RPK-VMS

## MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS

**COHEN & GREEN P.L.L.C.**

1639 Centre Street, Suite 216
Ridgewood, New York 11385
Phone: **(**929) 888-9480

**RICKNER MOSKOVITZ**

14 Wall Street, Suite 4C
New York, New York 10005
Phone: (212) 300-6506

On the Brief:

    Elena Cohen, Esq.
    Rob Rickner, Esq.

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ........................................................................................................**i**

**TABLE OF AUTHORITIES** ...............................................................................................**ii**

**PRELIMINARY STATEMENT** ...........................................................................................**1**

**STATEMENT OF FACTS** ....................................................................................................**1**

**ARGUMENT** ...........................................................................................................................**5**

    I.  THE DISCRETIONARY FUNCTION EXCEPTION IS NO DEFENSE TO EADDY'S CLAIM ................................................................................................................**5**

        a.   BOP directives only allow the Unit Manager to make housing assignments. ..................**5**

    II. THE UNITED STATES DID NOT SERVE AN EFFECTIVE DENIAL LETTER, AND EVEN IF IT DID, PLAINTIFF IS ENTITLED TO EQUITABLE TOLLING. ......................**9**

        a.   The United States did not serve an effective denial letter. .................................**9**

        b.   Mail service standards mean the government knew the denial was ineffective. ............**13**

        c.   The facts here call for equitable tolling. ....................................................................**14**

           1.   Plaintiff has plausibly pled extraordinary circumstances. ..........................................**14**

           2.   Plaintiff has plausibly pled the required diligence. ....................................................**16**

    **CONCLUSION** ..................................................................................................................**17**

# TABLE OF AUTHORITIES

### CASES

*Anson v. United States*, 294 F. Supp. 3d 144 (W.D.N.Y. 2018) ........................................7

*Berkovitz v. United States*, 486 U.S. 531 (1988) .......................................................5, 6

*Bunch v. United States*, 880 F.3d 938 (7th Cir. 2018) ...................................................7

*Cangemi v. United States*, 13 F.4th 115 (2d Cir. 2021).................................................5

*Casey v. United States*, 161 F. Supp. 2d 86 (D. Conn. 2001)...................................14, 16

*Davis v. Goldstein*, 563 F. App'x 800 (2d Cir. 2014).......................................................9

*Doe v. United States*, 76 F.4th 64 (2d Cir 2023)........................................................14, 16

*Eppel v. United States*, 744 F. Supp. 3d 199 (E.D.N.Y. 2024)........................................5

*Gallagher v NY State Bd. of Elections*, 477 F Supp 3d 19 (S.D.N.Y. 2020)..................13

*Herrera v. United States*, No. 20-CV-10206 (PKC), 2022 WL 902090

    (S.D.N.Y. Mar. 27, 2022) ........................................................................................6

*Jones v United States Postal Serv.*, 488 F Supp 3d 103 (S.D.N.Y. 2020)....................13

*Leibowitz v. United States*, No. 2:23-CV-05677 (LGD), 2025 WL 2252386

    (E.D.N.Y. July 30, 2025) ........................................................................................7

*Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 597 F.3d 84 (2d Cir. 2010)............9

*Matos v. United States*,  380 F. Supp. 2d 36 (D.P.R. 2005) ...........................................9

*Matthews v. Gilley*. No. 6:24-CV-62 (REW), 2025 WL 2345816

    (E.D. Ky. Aug. 13, 2025)................................................................................13, 14, 15

*Moya v. Department of Veteran's Affairs*, 35 F3d 501 (10th Cir. 1994)......................10

*Mulder v. Commissioner*, 855 F.2d 208 (5th Cir., 1988)..............................................10

*Perez v. United States*, 167 F.3d 913 (5th Cir. 1999) ...............................................14, 16

*Ruiz ex rel. E.R. v. United States*, No. 13-CV-1241, 2014 WL 4662241

  (E.D.N.Y. Sept. 18, 2014) ...................................................................................7

*Santos v. United States*, 559 F.3d 189 (3rd Cir. 2009) .................................................14

*United States v. Gaubert*, 499 U.S. 315 (1995) ..........................................................5, 6

*Young v. United States*, No. 12-CV-2342 ARR SG, 2014 WL 1153911

  (E.D.N.Y. Mar. 20, 2014) ...................................................................................6

**STATUTES**

28 U.S.C. § 1346(b)(1) .........................................................................................5

28 U.S.C. § 2680(a) .............................................................................................5

Plaintiff Antonio Eaddy hereby submits this Memorandum of Law in Opposition to the Defendant United States' Motion to Dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

## PRELIMINARY STATEMENT

On May 10, 2022, a BOP employee who did have authority to do so moved Plaintiff Antonio Eaddy to a notoriously unsafe housing unit at MDC Brooklyn. That very same day, Plaintiff was attacked. Inmates slit his throat with a knife and he nearly bled to death. This violent attack was negligently caused by a correction officer, Lt. Santucci, who moved Eaddy to this dangerous dorm even though he had no discretion, whatsoever, to do so. While in custody and without the assistance of an attorney, Eaddy completed a Standard Form 95, listing his home address, to which he was scheduled to be released. Defendant United States of America sent Eaddy a denial letter over a holiday weekend to his institutional address (not the correct address he put on the form), where he was set to be released just two business days after the letter was mailed. USPS tracking shows that the letter was lost in the mail, and none of the multiple types of records kept for certified nail to federal inmates exist. Defendant now moves for dismissal. For the reasons set forth below, Plaintiff respectfully request that the Court deny Defendant's motion.

## STATEMENT OF FACTS

Antonio Eaddy, brought this action under the Federal Torts Claim Act ("FTCA") for an incident that occurred while he was incarcerated at the Metropolitan Detention Center Brooklyn.[1] Before April 25, 2022, Eaddy was living in general population housing unit 52 until May 10, 2022,

---

[1] The Amended Complaint is referenced as "C¶_." The Memorandum in Support of The Defendant's Motion to Dismiss is referenced as "MTD _." The exhibits to the Declaration of Alexandria Megaris ("Megaris Decl.,"), dated July 21, 2025 are referenced as "D-Ex. _". Th exhibits to the Declaration of Elena Cohen ("Cohen Decl."), dated September 3, 2025 are referenced as "P-Ex._".

when was placed in the Special Housing Unit ("SHU") after being accused of participating in an altercation with other inmates despite repeated attempts to prove his innocence. C¶1-2.

While in solitary confinement, an investigator interviewed Eaddy about his alleged involvement in the altercation, during which Eaddy reiterated that he was not involved. C¶15-16. The investigator informed Eaddy that he would return to housing unit 52 after he confirmed his version of events. C¶16. Eaddy remained in the SHU for nearly a month until prison personnel confirmed his story. *Id.*

The incident in question occurred on May 10, 2022, when a Lt. Santucci informed Eaddy that he was being released from the SHU and sent to housing unit 51 rather than his original unit 52. C¶17. According to Eaddy, this unit was notorious as a housing unit for gang members and was extremely dangerous for someone who was not a member of any such gang like Eaddy. C¶18. Indeed, this unit saw regular fights between detainees and Eaddy expressed his anxiety about being transferred to this unit where he knew no one and could not be protected. C¶18. After hearing Eaddy's concerns, Lt. Santucci informed Eaddy that his only option was to either remain in solitary confinement or go to unit 51. After nearly a month in the SHU, Eaddy was suffering mentally and emotionally and opted for unit 51 rather than remain in isolation. C¶19. According to another corrections officer, Eaddy's transfer to housing unit 51 was not approved and his belongings were still in unit 52. C¶20.

Soon after Eaddy entered his assigned cell in housing unit 51, another detainee entered the cell and barraged him with questions. C ¶22. At this time his new cellmate left the cell and upon his return, moved behind Eaddy and began to attack him. C¶22-23. Multiple detainees entered the cell and joined the attack on Eaddy while another person stayed outside the closed cell door and kept watch. C¶23. At the time of the attack, Eaddy was suffering from a broken foot and had

2

limited mobility, which prevented him defending himself from his attackers. C¶24. As a result, Eaddy's broken foot was stepped on and was severely swollen, he sustained multiple gashes on the left side of his face and head, including a swollen eye and a large laceration stretching six inches from his ear down the left side of his neck. C¶25-26, 33.

The attack only subsided when Eaddy's neck wound began to bleed profusely and caused him to briefly blackout. Eaddy heard multiple detainees say he was "dying," before he was able to stumble out of the cell and towards the corrections officers stationed at the housing unit door. C¶28-29. As Eaddy made his way to the housing unit door, he passed corrections officers who did not come to his aid and the officer who buzzed him out of the unit told a BOP nurse to "leave him." Fortunately for Eaddy, the nurse did not heed their order and assisted him out of the unit and to an ambulance. C¶30-31. Eaddy was transported to NYU Langone Brooklyn Hospital where the doctors informed him that the laceration to his neck was close to his main artery and so severe that he could have died from blood loss. C¶32. After receiving medical treatment, including stitches, at the hospital, Eaddy was transported back to MDC and placed back in the SHU where he remained for approximately five months. C¶34, 38. During this time, BOP staff failed to remove Eaddy's stitches in a timely manner, and he was denied pain medicine and treatment for his injuries. C¶36-37.

Today, Eaddy suffers from ongoing emotional and psychological distress from the severe trauma of this attack which includes nightmares, paranoia, and suicidal ideation. C¶40. In addition to the emotional trauma Eaddy continues to suffer, he also experiences ongoing pain in his neck from the wound inflicted, which is very visible due to its length and the discoloration of scar tissue. C¶39.

3

According to regulations within the Federal Bureau of Prisons Program Statement, an inmate's housing assignment is based on their behavior or offense severity to determine any security, medical, psychological, or other needs. C¶43-44. These regulations also dictate that a pretrial inmate's housing assignment is determined solely by the Unit Manager and cannot be delegated to a lower-level officer without the Warden's written authorization. C¶46. In Eaddy's case, no such authorization was given to move him to housing unit 51 and the Program Statement's directives do not give higher ranking officers any authority to independently make housing reassignments. C¶46, 48.

In the aftermath of this incident, Eaddy completed a Standard Form 95 on July 11, 2022, while he was still incarcerated at MDC and prior to retaining counsel. D-Ex. 4, p. 32. On this form, Eaddy listed his home address, rather than the MDC address because he was expecting to be released in the coming months. *Id*. Indeed, Eaddy was released on June 21, 2023. C¶7. The Federal Bureau of Prisons sent Eaddy a notice of denial dated June 13, 2023, from Philadelphia. D-Ex. 1. A USPS tracking statement shows that on Friday, June 16, 2023, at 11 pm, the notice of denial was processed through a USPS facility in Philadelphia. D- Ex. 2. This same tracking statement does not show a final destination. Instead, it shows that as of June 26, 2025, the last known location of the notice was at this USPS facility in Philadelphia, PA. *Id*. Importantly, the Federal Bureau of Prisons mailed the notice of denial to the wrong address. The address listed on Eaddy's SF-95 was 49 Crown Street, Apt. 15C Brooklyn, New York. D-Ex. 4, p. 32. This is where Eaddy returned after leaving custody, and where his family lived during this time period. C¶7. However, according to the Domestic Return Receipt and the BOP's own declaration, the notice was sent to the Federal Correction Institution in Otisville, New York. Megaris Decl., ¶2. Eaddy was released from custody on Wednesday, June 21, 2023. C¶7. He did not receive the denial letter. C¶5.

4

Shortly after his release, Eaddy retained counsel and filed another Standard Form 95 on May 6, 2024. C¶ 8. Eaddy received a response from the BOP denying the claim on May 30, 2024. C¶ 9.

## ARGUMENT

## I.    THE DISCRETIONARY FUNCTION EXCEPTION IS NO DEFENSE TO EADDY'S CLAIM.

The United States accurately outlines the test for determining whether the waiver of immunity under 28 U.S.C. § 1346(b)(1) authorizes this claim or whether the discretionary function exception to that waiver in 28 U.S.C. § 2680(a) bars it—the *Berkovitz-Gaubert* test. *Berkovitz v. United States*, 486 U.S. 531 (1988); *United States v. Gaubert*, 499 U.S. 315 (1995). But the United States fails to address a key line of cases that undermines its arguments: The United States cannot satisfy the first prong of the test because "a government action is non-discretionary when it is 'inconsistent with a specific mandatory directive.'" *Eppel v. United States*, 744 F. Supp. 3d 199, 204 (E.D.N.Y. 2024) (quoting *Cangemi v. United States*, 13 F.4th 115, 130 (2d Cir. 2021) and *Berkovitz*, 486 U.S. at 536 (1954)).

Here, the United States cannot satisfy the *Berkovitz-Gaubert* test, the discretionary function exception does not apply, and the Court has subject matter jurisdiction over Eaddy's claim.

### a.    BOP directives only allow the Unit Manager to make housing assignments.

The United States' motion is premised on the assumption that any correction officer has the discretion to decide where a detainee is housed inside MDC Brooklyn.[2] Housing assignments in a prison can be life or death decisions, particularly in a facility like MDC Brooklyn that houses members of the most dangerous gangs in the country. It would be absurd to think that the BOP

---

[2] The United States also argues that it was within the correction officers' discretion as to when or how to stop the attack. Plaintiff, however, is only claiming that the housing assignment was negligent.

would give every single correction officer unfettered discretion to move detainees to whatever housing assignment that officer wants. And of course the BOP allows no such thing. There is a Unit Manager that makes housing assignment determinations, for the safety of the detainees, and Lt. Santucci is not a Unit Manager. So he had no discretion to reassign Eaddy.

The discretionary function exception only applies if the governmental official at issue actually has the discretion to take the challenged action. So when an officer fails to act "in accord with a specific mandatory directive, the discretionary function exception does not apply." *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 544 (1988). "If [an] employee violates [a] mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy." *United States v. Gaubert*, 499 U.S. 315, 324 (1991). BOP policy directives that prescribe a specific course of action are mandatory and give correction offices no discretion to act otherwise. For example, in *Herrera v. United States*, BOP Policy 5324.12 required correction officers to report any suspicions of sexual abuse, and because the officers' failed to do so, the court found that "the plaintiffs' FTCA claims against the United States do not fall under the discretionary function exception." No. 20-CV-10206 (PKC), 2022 WL 902090, at *10 (S.D.N.Y. Mar. 27, 2022). Neither of the cases cited by the United States hold otherwise. Indeed, a case cited by the United States held that "[h]ousing assignments are left to the discretion of prison administrators." *Young v. United States*, No. 12-CV-2342 ARR SG, 2014 WL 1153911, at *11 (E.D.N.Y. Mar. 20, 2014). Lt. Santucci was not an administrator.

Further, the United States has the burden of proving that the discretionary function exception applies. "Neither the Second Circuit nor the United States Supreme Court has explicitly answered whether the United States or a plaintiff bears the ultimate burden of proving the applicability of the discretionary function exception." *Leibowitz v. United States*, No. 2:23-CV-

05677 (LGD), 2025 WL 2252386, at *9 (E.D.N.Y. July 30, 2025) (quoting *Ruiz ex rel. E.R. v. United States*, No. 13-CV-1241, 2014 WL 4662241, at *4 (E.D.N.Y. Sept. 18, 2014)). However, "the weight of authority from district courts in this Circuit suggests that the burden belongs to the Government." *Id.* (collecting cases). The plaintiff has the "initial burden of stating a claim that falls within the scope of FTCA's waiver of sovereign immunity," and then the government has the burden of proving the exception applies at trial. *Anson v. United States*, 294 F. Supp. 3d 144, 158 (W.D.N.Y. 2018); *see also Leibowitz*, 2025 WL 2252386, at *9 ("This Court agrees with the numerous courts that have held explicitly that the government bears the burden of demonstrating the applicability of the discretionary function exception."). This is particularly apt in case like this, involving the intricacies of housing assignment requirements, because "the government, not the plaintiff, will generally have superior access to the information that might trigger an exception." *Leibowitz*, 2025 WL 2252386, at *10 (quoting *Bunch v. United States*, 880 F.3d 938, 942 (7th Cir. 2018)).

Plaintiff's Amended Complaint has more than enough detail to adequately allege a mandatory policy here. Within 48 hours of admission, an initial assessment must be completed, whereby BOP staff can seek information pertaining to an "inmate's behavior or offense severity, thereby helping to determine the inmate's security, medical, psychological, and/or other special needs," pursuant BOP Policy directive 7331.05(7)(b). C¶44. After this assessment is complete, BOP staff will make a recommendation for housing to the Unit Manager, the individual responsible for overseeing all unit programs and activities, pursuant that same Policy, which is also outlined in the Inmate Admission & Orientation Handbook. C¶45. The same Policy also makes it clear that the decision regarding a pretrial inmate's housing assignment is made solely by the Unit Manager. C¶46. The Unit Manager is not a rank, like a lieutenant or sergeant. Instead, it is the lead of the

Unit Team. The Unit Team, also known as the Classification Team, is responsible for housing assignments. C¶47. Beyond the Unit Manager, the Unit Team includes the Case Manager, Correctional Counselor, and Unit Secretary. The Staff Psychologist, Education Advisor and Unit Officer are also considered members of the Unit Team and provide input for classification purposes—to ensure that the detainee will be safe. C¶47. Indeed, the Policy states that Unit Managers are responsible for regular reviews of pretrial detainees, called the Program Review, and "[d]uring each inmate Program Review, the Unit Manager is responsible for reviewing work, programming, and housing unit assignments." C¶50. And the Unit Manager even remains the decision-maker for housing assignments after conviction, retaining the authority to make custody assignments. C¶51. The Unit Manager is also the signature authority on the BP-338, the housing assignment form, under BOP Policy P5100.08(D)(1). C¶51. If the Unit Manager cannot sign, the Warden must sign and approve the BP-338. C¶51.

The United States, pointedly, does not dispute this analysis. The whole point of the Unit Manager, based on a plain reading of the directives, is to have someone who has broad knowledge of the detainee and the facility to make sure that housing assignments are safe. A rogue officer like Lt. Santucci, who decides on a whim to transfer a detainee, like Eaddy, to a dangerous new a housing assignment, with no authority to do so, is not acting within his discretion. The system is set up to prevent this from happening, because the United States knows that the wrong housing assignment can get someone maimed, like Eaddy, or killed.[3]

The United States does claim that "Plaintiff was assigned to a general population unit 51," and attaches a printout with numbers that perhaps mean the same thing, but nothing in the Santucci Declaration says that a Unit Manager approved the transfer, as required. So Eaddy has met his

---

[3] *See* https://www.nytimes.com/2024/10/28/nyregion/doj-mdc-brooklyn-prison.html

burden of showing that Lt. Santucci violated a mandatory directive because he had no authority to reassign Eaddy, and the United States has not met its burden of proving otherwise. Thus, the discretionary function exception simply does not apply.

## II.    THE UNITED STATES DID NOT SERVE AN EFFECTIVE DENIAL LETTER, AND EVEN IF IT DID, PLAINTIFF IS ENTITLED TO EQUITABLE TOLLING.

The United States claims that because they have a letter and a tracking number, no matter what other evidence there is, Eaddy's case is time-barred because of the initial denial letter, which no party claims Eaddy ever received. This fails.

### a.    The United States did not serve an effective denial letter.

The single case from the Second Circuit that the United States relies on fatally undermines its argument. In *Davis v. Goldstein*, the Second Circuit ruled that if an FTCA denial letter has been mailed, mere denial of receipt by the plaintiff is not enough to prevent dismissal. 563 F. App'x 800, 802–03 (2d Cir. 2014). But this ruling was based on a finding that the "presumption of receipt" applies where the record shows that "office procedures," were "followed in the regular course of business." *Id.* (quoting *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 597 F.3d 84, 92 (2d Cir. 2010). To defeat this presumption, a plaintiff must show that "routine office practice was not followed or was so careless" that the presumption that the letter was received is unreasonable. *Id.* And that is exactly what Eaddy has shown here.

Further, the purpose of sending a certified letter with a request for a return receipt is to make sure that the sender knows that the letter was actually received. In *Matos v. United States*, the United States sent a denial letter to an attorney's physical address, rather than the Post Office box the attorney used for mail, the attorney never got the letter, and the United States never received the return receipt. 380 F. Supp. 2d 36, 37-40 (D.P.R. 2005). The court held that "[w]hile the law presumes delivery of a properly addressed piece of mail, no such presumption exists for

certified mail where the return receipt is not received by the sender." *Id*. at 38 (citing *Mulder v. Commissioner*, 855 F.2d 208, 212 (5th Cir., 1988)). In fact, the court explained, "the sender of the certified letter who does not receive the return receipt is on notice that the addressee may not have received the letter." *Id*. at 38 (citing *Moya v. Department of Veteran's Affairs*, 35 F3d 501, 503 (10th Cir. 1994)). Consequently, the court denied the motion to dismiss because, when the return receipt never comes back, it is the sender's responsibility "to inquire with the addressee or send the letter again." *Id*. And that is exactly what the United States should have done here. They should have checked to see if the denial letter arrived, and then re-sent it. The United States is not entitled to rely on the presumption of receipt on these facts.

Eaddy filed a Form 95 on July 28, 2022. *See, e.g.*, MTD at 15. The Form 95 did not list FCI Otisville as Plaintiff's address. D-Ex. 4, p. 32. Instead, the Form 95 listed a residential address in Brooklyn where Eaddy's family lived, and where he was directed to return after being released from custody. *Id*.; C¶7. Eaddy was released from custody on June 21, 2023, and he returned to the address on the Form 95, as planned. C¶7. The Federal Bureau of Prisons sent Eaddy a notice of denial dated June 13, 2023, from Philadelphia. D-Ex. 1. The notice was sent to the Federal Correction Institution in Otisville, New York—not the correct address that Eaddy put on the Form 95. D-Ex. 2. Although the denial letter is dated June 13, 2023 (a Wednesday), it was not actually mailed until June 16, 2023 (a Friday). The USPS tracking statement shows that on Friday, June 16, 2023, at 11 pm, the notice of denial was processed through a USPS facility in Philadelphia—the City it had originated from. D- Ex. 2. This same tracking statement does not show a final destination. Instead, it shows that as of June 26, 2025, the last known location of the notice was at this USPS facility in Philadelphia. *Id*.

The letter was sent certified mail return receipt requested, and there is no record of the return receipt being received. *Id*. BOP policy requires that prison staff return the return receipt. P-Ex. 2. Eaddy was released from custody in Upstate New York on Wednesday, June 21, 2023— just two business days[4] (including a Saturday) after the denial was processed in Pennsylvania. C¶7. Per the BOP Mail Management Manual, staff are required to open and inspect all inmate mail and packages prior to distribution. P-Ex. 2. This creates a delay from the time when mail is received at an institution to when it is given to an inmate.

BOP policy on mail also includes entire section on certified mail sent to inmates, Section 4.9. P-Ex. 2. This is "[b]ecause judicial and legal notices are often sent to inmates by certified mail, actual delivery to the inmate must be documented, preserved, and readily accessible for future verification in court proceedings." *Id*.  The BOP mail management policy on certified mail to inmates mandates (a) "If a Return Receipt has been attached, mail room staff will sign the receipt, which will be dispatched in the next regular mail;" and (b) "Incoming Certified Mail Log. Institution mail room staff must maintain an Incoming Certified Mail Log documenting all incoming inmate certified mail." *Id*. These certified mail logs showing that certified mail was received at an institution and given to an inmate must be maintained for 11 years. *Id*. "If a piece of incoming controlled mail (registered, certified, etc.) is lost or misplaced, the sender (not the inmate) must initiate the traces and follow-up action with the USPS or private carrier." This is because the "sender is in the best position to initiate tracing activities because it was the sender who paid the fees, completed the forms, and knew the mailing circumstances." P-Ex. 2.

BOP policy on inmate mail when an inmate leaves custody states that mail sent to inmates should be forwarded to that person's new out-of-custody address for a period of 30 days. After 30

---

[4] June 19 is a federal holiday.

days, or if there is no new address, the mail should be returned to sender. P-Ex 1, BOP Correspondence Program Statement § 540.25, "Change of address and forwarding of mail for inmates." There is no record here that the denial letter was sent to Eaddy's out of custody address (again, the same address as on his Form 95) or that it was returned to the sender.

This factual record—created without the benefit of discovery—shows that any presumption of that Eaddy received the denial letter is entirely rebutted. The parties agree there is no record that the denial letter, which mailed on the Friday before a holiday weekend, ever made it out of Pennsylvania, or to FCI Otisville at all, much less to the Plaintiff himself before he was released from custody 2 business days later. Because the United States mailed the certified denial letter to a Federal Correction Institution, a log of mail received at the facility would show that the letter was received. The United States has produced no such log. A log of mail delivered to inmates would show that the letter was delivered to Plaintiff. The United States has produced no such log. Both of these logs must be maintained for 11 years, and since this mailing was done 2 years, the records would show that this certified denial letter was received and given to Eaddy. There is no record showing that the United States forwarded the denial letter to the out-of-custody address that Eaddy provided to the United States. If FCI Otisville actually received the denial letter, staff was required to return the certified mail receipt, but the United States has no record of receiving the return receipt. Certified mail to inmates has special procedures precisely for the issues raised in this case: not receiving important mail related to a possible lawsuit can mean that the inmate misses important deadlines. This is why an FTCA denial letter must be sent by certified mail, and why there is so much record keeping around certified mail to inmates.

But the United States here has provided *none* of these records. The only evidence the United States has provided suggests that this denial letter was lost in the mail. The United States

argues that these facts should have no bearing, alleging (without citation to any case) that "[u]nder the FTCA, whether the notice was received by FCI Otisville or Plaintiff is irrelevant." MTD at 15. They are wrong.

### b. Mail service standards mean the government knew the denial was ineffective.

In context, the facts above also mean the Government sent the denial knowing that it would not reach Plaintiff. As discussed below and above, a denial sent an address known to be incorrect is ineffective. *See, e.g., Matthews v. Gilley*. No. 6:24-CV-62 (REW), 2025 WL 2345816, at *2 (E.D. Ky. Aug. 13, 2025). The timeline here, all based on the conduct of the government's employees, means the person who placed the denial in the mail on June 16, 2023 knew — for a virtual certainty — that it would not arrive before Plaintiff was released.

USPS Mail between Philadelphia and New York typically has a two-day service standard. *See generally*, USPS Transit Time Map, USPS.com, *available at* https://www.usps.com/service-standards/. That — in theory — "means that over 98 percent of mail placed in a collection box or delivered to a post office will arrive within two days, excluding Sunday." (*Gallagher v NY State Bd. of Elections*, 477 F Supp 3d 19, 30 (S.D.N.Y. 2020)) — though that standard can be aspirational (*see, e.g., Jones v United States Postal Serv*., 488 F Supp 3d 103, 118 (S.D.N.Y. 2020)). But even assuming no issues with the two day service standard — and assuming processing inmate mail takes just 24 hours — counting from sending the denial, Friday, June 16, 2023, the government knew there was a "virtual certainty" (*Gallagher*, 477 F Supp 3d at 51) that there was little to no chance Plaintiff would actually receive the denial before his release: With the denial placed in the mail (assuming it was before 5:00 p.m.) on June 16, the first service day of the two day standard was Saturday, June 17; Sunday, June 18 was not part of the "two day" service standard; June 19 was a federal holiday (Juneteenth) and not part of the "two day" service standard; and Tuesday, June 20 was the second day. So, with Plaintiff was scheduled to be released

(and was in fact released) on Wednesday June 21, 2023 — and with even the most minor processing delay in the mail, *see* P-Ex2, on June 16, the government knew there was virtually no chance the denial would actually reach Plaintiff. That makes the denial ineffective.

### c. The facts here call for equitable tolling.

In the alternative, this Court should permit Eaddy's claim under the doctrine of equitable tolling. "Equitable tolling is a doctrine that permits courts to extend a statute of limitations on a case-by-case basis to prevent inequity." *Doe v. United States*, 76 F.4th 64, 71 (2d Cir 2023). It applies in FTCA cases, and requires a showing "of two elements: first, that some extraordinary circumstance stood in [Plaintiff's] way and second that [Plaintiff] has been pursuing [his] rights diligently." *Id.* (alterations adopted, quotation marks omitted). At the motion to dismiss or summary judgment stage, the Second Circuit has been clear that this is a plaintiff-favored test: It only need be shown that "reasonable district court acting in a fact-finding capacity could determine that the prerequisites to equitable tolling—extraordinary circumstances and reasonable diligence—are present on this record." *Id.* (reversing dismissal). Courts regularly permit equitable tolling in FTCA cases. *See, e.g., Santos v. United States*, 559 F.3d 189 (3rd Cir. 2009); *Perez v. United States*, 167 F.3d 913, 914 (5th Cir. 1999); *Casey v. United States*, 161 F. Supp. 2d 86, 88 (D. Conn. 2001). Courts are particularly inclined to weigh in favor of equitable tolling for incarcerated people who file a Form 95 *pro se*. *See Matthews v. Gilley*, No. 6:24-CV-62-REW, 2025 WL 2345816, at *2 (E.D. Ky. Aug. 13, 2025).

### 1. Plaintiff has plausibly pled extraordinary circumstances.

Plaintiff has plausibly pled extraordinary circumstances. As set out above, the United States mailed a denial letter to a different address from the one that Eaddy provided. Tracking documents show that the denial letter was likely lost in the mail—never making it out of Pennsylvania. No records from the federal correctional institute show that it ever arrived there or

was given to Plaintiff. And all of this happened days before he was released from custody, over a federal holiday. If this trio of facts- a denial letter demonstrably lost in the mail, sent to the wrong address, as Plaintiff was being released from the custody of where the letter was sent- do not amount to extraordinary circumstances, it is unclear what ever could. And this all happened while Plaintiff was proceeding *pro se*, which further weighs in favor of equitable tolling.

Almost directly on point is *Matthews v. Gilley*. No. 6:24-CV-62-REW, 2025 WL 2345816, at *2 (E.D. Ky. Aug. 13, 2025).  There, the Government sent a denial to the wrong address—one the imprisoned plaintiff had listed on his Form 95, had then changed when he transferred to a new facility, but was then told "the Regional Office was unable to accommodate his request and would continue to send his mail to" the prior address.  *Id*. at *4.  Given the questions this raised—"when Matthews first received actual notice that his FTCA claim was denied," "why the Regional Office declined Matthews's request to forward his mail to NSDC," whether "the Regional Office knowingly sent the denial letter to the wrong address," and so on—the Court explained that "prior to discovery, such a determination" on whether equitable tolling is available "is premature."  *Id*. at *5-6.  So too here.  The record here does not answer these same questions (1) when did Plaintiff first receive actual notice that his FTCA claim was denied; (2) why the denial was sent to Otisville, rather than the permanent address Plaintiff put on his Form 95; (3) whether the Government knew of Plaintiff's impending release days later when it sent the denial; (4) what the average processing time for mail at FCI Otisville was (and whether the relevant office was aware of that when sending the denial); (5) whether the Government knew it was sending the denial to a different from the one Plaintiff requested days before his release, practically ensuring he would not receive it; and (6) why, when Plaintiff's release date was just one week away, it waited two days to a Friday (just before the holiday weekend) to mail the earlier-dated denial letter.

The Second Circuit has also recently signaled that circumstances for equitable tolling in FTCA cases should be considered holistically, fashioning a flexible approach to achieve justice. In *Doe v. United States*, the Second Circuit found that the "psychological impact of long-term or extreme sexual abuse can constitute an extraordinary circumstance that prevents a victim from coming forward even for some time after the abuse has ceased." 76 F.4th 64, 67 (2d Cir. 2023). In *Casey v. United States*, the court applied equitable tolling because government employees violated a duty to tell plaintiff about the requirement to file a Form 95. 161 F. Supp. 2d 86, 88 (D. Conn. 2001). *Perez v. United States*, the Fifth Circuit applied equitable tolling because the plaintiff had misunderstood "the dual nature of the Texas National Guard." 167 F.3d 913, 914 (5th Cir. 1999).

The equitable tolling doctrine is flexible, and can (and does) account for the inequitable situation here, where there is no evidence at all that Plaintiff even knew his claim had been denied — and every indication that the Government specifically knew (1) the denial was unlikely to reach Plaintiff; (2) that it, in fact, did not reach him; and (3) that silence on that count could prejudice Plaintiff. This is especially warranted given Eaddy's young age, and that he almost died in this incident after being attacked by a group of people and his neck slashed open and he was left to bleed to death.

### 2. Plaintiff has plausibly pled the required diligence.

Plaintiff exercised reasonable diligence here, in hiring attorneys and filing a timely Form 95 after his release from custody. "The diligence required for equitable tolling purposes is reasonable diligence, not maximum feasible diligence." *Doe v United States*, 76 F.4th 64, 73 (2d Cir 2023). Unlike other cases, the amount of time at issue here is (relatively speaking) minimal. *See, e.g., id*. Plaintiff followed up promptly after his release—and promptly after it turns out the Government had sent a purported denial—by retaining counsel and filing a new Form 95, assuming

16

something had gone wrong with the previous one.  C¶8.  At the time, Plaintiff had no knowledge of a denial—and responses and denials with Form 95s routinely take many months (if not more than a year).  Plaintiff's second Form 95 was also within the statutory of limitations for a Form 95. In this circumstance, particularly given that the second Form 95 would have been timely in its own right, his diligence was reasonable.

## CONCLUSION

For the reasons stated above, the United States' motion to dismiss should be denied.

Dated:  New York, New York
      September 3, 2025

**COHEN & GREEN P.L.L.C.**

By:        /s/

     Elena Cohen, Esq.

1639 Centre Street, Suite 216
Ridgewood, New York 11385
Phone: (929) 888-9480

**RICKNER MOSKOVITZ**

By:        /s/

     Rob Rickner, Esq.

14 Wall Street, Suite 4C
New York, New York 10005
Phone: (212) 300-6506

*Attorneys for Plaintiff*

17

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------------------X

ANTONIO EADDY,

                                        Plaintiff,                    Case No. 24-cv-08109
                                                                     (RPK) (VMS)
                        -against-

UNITED STATES OF AMERICA

                                        Defendant.

-----------------------------------------------------------------------------------X

### DECLARATION OF ELENA L. COHEN IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Elena L. Cohen, an attorney duly admitted to practice before this Court, hereby declares

under penalties of perjury that the following statements are true and correct:

1.      I am co-counsel for Plaintiff Antonio Eaddy in this case.

2.      I make this declaration in support of Plaintiff's opposition to Defendant's motion to

dismiss the First Amended Complaint.

3.      Attached as Exhibit 1 is a true copy of U.S. Department of Justice, Federal Bureau

of Prisons Program Statement 5265.14, dated April 5, 2011, on the topic of Correspondence

(hereinafter "BOP Correspondence Program Statement"). This is a policy in effect currently and at

all relevant times herein on mail sent to a federal correctional institution.

4.      The BOP Correspondence Program Statement § 540.25 "Change of address and

forwarding of mail for inmates" states that mail sent to inmates should be forwarded to that

person's new out of custody address for a period of 30 days. After 30 days, or if there is no new

address, the mail should be returned to sender.

5.      Attached as Exhibit 2 is a true copy of U.S. Department of Justice, Federal Bureau

of Prisons Program Statement 5800.16, dated April 5, 2011, on the topic of "Mail Management

Manual" (hereinafter "BOP Mail Management Manual"). This is a policy in effect currently and at all relevant times herein on mail sent to and received by a federal correctional institution.

6.      Per the BOP Mail Management Manual, except in the case of emergencies where mail cannot be delivered, Federal Correctional Institutions provide mail services Monday- Friday. They do not usually provide mail services on the weekend, besides holidays like Christmas. BOP Mail Management Manual, Section 1.4.

7.      Per the BOP Mail Management Manual, staff are **required to open and inspect** all inmate mail and packages prior to distribution. BOP Mail Management Manual, Section 1.12 (emphasis in original).

8.      Per the BOP Mail Management Manual, a "log will be maintained for all incoming registered, certified, or insured letters and packages addressed to staff. A separate log may be used for each type of mail and appropriate receipts are to be obtained." BOP Mail Management Manual, Section 2.11.

9.      Per the BOP Mail Management Manual, "[i]f a piece of incoming controlled mail (registered, certified, etc.) is lost or misplaced, the sender (not the inmate) must initiate the traces and follow-up action with the USPS or private carrier. The sender is in the best position to initiate tracing activities because it was the sender who paid the fees, completed the forms, and knew the mailing circumstances." BOP Mail Management Manual, Section 3.1.

10.     The BOP Mail Management Manual contains an entire section on certified mail sent to inmates, Section 4.9., This is "Because judicial and legal notices are often sent to inmates by certified mail, actual delivery to the inmate must be documented, preserved, and readily accessible for future verification in court proceedings." The BOP mail management policy on certified mail to inmates mandates:

a.    "If a Return Receipt has been attached, mail room staff will sign the receipt, which will be dispatched in the next regular mail;"

b.    **"Incoming Certified Mail Log.** Institution mail room staff must maintain an Incoming Certified Mail Log documenting all incoming inmate certified mail;"

c.    "The Inmate Certified Mail Log books will be transferred to the FRC and retained for 11 years."

Dated: Brooklyn, New York
         September 3, 2025

**ELENA L. COHEN**

Cohen Green PLLC
1639 Centre St, Suite 216
Ridgewood, NY 11385
929-888-9650
elena@femmelaw.com



**U.S. Department of Justice**
Federal Bureau of Prisons

P R O G R A M   S T A T E M E N T
OPI:          CPD/CPB
NUMBER:    5265.14
DATE:          April 5, 2011

# Correspondence

/s/
*Approved*: Harley G. Lappin
Director, Federal Bureau of Prisons

## 1.  PURPOSE AND SCOPE

**§ 540.10 Purpose and scope.**

**The Bureau of Prisons encourages correspondence that is directed to socially useful goals.  The Warden shall establish correspondence procedures for inmates in each institution, as authorized and suggested in this rule.**

Institution guidelines concerning correspondence will be made widely available to staff and inmates through posting on bulletin boards, placement in the institution library, or other appropriate means.

a.  **Summary of Changes**

*Policy Rescinded*
P5265.11          Correspondence (7/9/99)

This edition of the Program Statement incorporates changes that have occurred since its last publication and initiatives resulting from the Reduction and Elimination of Duties Management Assessment Project (REDMAP):

■  Now requires that funds intended for an inmate's commissary account will be mailed by the sender directly to the centralized commissary account center.
■  Eliminates outgoing special/legal mail drop-boxes.

**Federal Regulations from 28 CFR are shown in this type.**
Implementing instructions are shown in this type.

- Institutions with a TRULINCS-generated mailing label system will ensure inmates use the mailing labels on all outgoing correspondence.
- Eliminates requirement to obtain subsequent authorization for inmates' with prior approval to correspond with immediate family members or co-defendants housed in a federal or non-federal facility.

b. **Program Objectives.** Expected results of this program are:

- Inmates will be able to send and receive correspondence per established procedures.
- Incoming and outgoing general correspondence will be subject to monitoring, reading, and inspection.
- Restrictions on general correspondence will be enforced for an inmate because of misconduct or for classification purposes.
- Incoming correspondence deemed inappropriate will be rejected.
- An inmate without funds will be provided a limited amount of postage stamps and mailing materials.
- An inmate will be permitted to possess a limited quantity of postage stamps.
- An inmate will be permitted to receive funds through the mail.

c. **Pretrial, Holdover, and Detainee Inmates.** Specific sections of this Program Statement pertain to either designated inmates or inmates in pretrial, detainee, or holdover status.

2. **DEFINITIONS**

## § 540.2 Definitions.

**(a) *General correspondence* means incoming or outgoing correspondence other than *special mail*. *General correspondence* includes packages sent through the mail.**

General correspondence refers to traditional mail sent or received via the U.S. Postal Service. For the purpose of this policy, general correspondence refers to inmate mail only.

The Warden or designee must give prior approval for an inmate to receive or send a package (see the Program Statement **Mail Management Manual**). Procedures for incoming publications are discussed in the Program Statement **Incoming Publications**. Procedures for inmate electronic messaging are addressed in the Program Statement **Trust Fund Limited Inmate Computer System (TRULINCS) — Electronic Messaging**.

**(1)  *Open general correspondence* means general correspondence which is not limited to a list of authorized correspondents, except as provided in § 540.17.**

28 CFR § 540.17 refers to Section 9 of this Program Statement.

**(2)  *Restricted general correspondence* means general correspondence which is limited to a list of authorized correspondents.**

**(b)  *Representatives of the news media* means persons whose principal employment is to gather or report news for:**

**(1)  A newspaper which qualifies as a general circulation newspaper in the community in which it is published.  A newspaper is one of "general circulation" if it circulates among the general public and if it publishes news of a general character of general interest to the public such as news of political, religious, commercial, or social affairs.  A key test to determine whether a newspaper qualifies as a "general circulation" newspaper is to determine whether the paper qualifies for the purpose of publishing legal notices in the community in which it is located or the area to which it distributes;**

**(2)  A news magazine which has a national circulation and is sold by newsstands and by mail subscription to the general public;**

**(3)  A national or international news service; or**

**(4)  A radio or television news program, whose primary purpose is to report the news, of a station holding a Federal Communications Commission license.**

**(c)  *Special mail* means correspondence *sent to* the following:  President and Vice President of the United States, the U.S. Department of Justice (including the Bureau of Prisons), U.S. Attorneys Offices, Surgeon General, U.S. Public Health Service, Secretary of the Army, Navy, or Air Force, U.S. Courts (including U.S. Probation Officers), Members of the U.S. Congress, Embassies and Consulates, Governors, State Attorneys General, Prosecuting Attorneys, Directors of State Departments of Corrections, State Parole Commissioners, State Legislators, State Courts, State Probation Officers, other Federal and State law enforcement offices, attorneys, and representatives of the news media.**

The Centers for Disease Control (CDC) is part of the U.S. Public Health Service; correspondence sent to the CDC is considered special mail.

An inmate is expected to use the special mail privilege responsibly.  Refer questions concerning alleged abuses to the Office of General Counsel.

**Special mail** also includes correspondence **received from** the following: President and Vice President of the United States, attorneys, Members of the U.S. Congress, Embassies and Consulates, the U.S. Department of Justice (excluding the Bureau of Prisons but including U.S. Attorneys), other Federal law enforcement officers, State Attorneys General, Prosecuting Attorneys, Governors, U.S. Courts (including U.S. Probation Officers), and State Courts.  For incoming correspondence to be processed under the special mail procedures (see §§ 540.18--540.19), the sender must be adequately identified on the envelope, and the front of the envelope must be marked "Special Mail — Open only in the presence of the inmate".

28 CFR §§ 540.18-19 refers to Sections 10 and 11, respectively, of this Program Statement.

d. *Warden* is defined in 28 CFR 500.1, separately published, as "... the chief executive officer of a U.S. Penitentiary, Federal Correctional Institution, Medical Center for Federal Prisoners, Federal Prison Camp, Federal Detention Center, Metropolitan Correctional Center, or any federal penal or correctional institution or facility. 'Warden' also includes any staff member with authority explicitly delegated by any chief executive officer."

3.  **MAIL DEPOSITORIES**

**§ 540.11 Mail depositories.**

**The Warden shall establish at least one mail depository within the institution for an inmate to place outgoing correspondence.  The Warden may establish a separate mail depository for outgoing special mail.  Each item placed in a mail depository must contain a return address. (see § 540.12(d)).**

28 CFR § 540.12(d) refers to Section 4.d. of this Program Statement.

The Warden of Federal Detention Centers, Metropolitan Correctional Centers, and Metropolitan Detention Centers will establish a mail depository to allow an attorney to "hand-deliver" legal mail to the institution (see the **Mail Management Manual**).  Other facilities housing pretrial inmates may also establish a mail depository for attorneys to "hand-deliver" special mail.

4.  **CONTROLS AND PROCEDURES**

**§ 540.12 Controls and procedures.**

**(a)  The Warden shall establish and exercise controls to protect individuals, and the security, discipline, and good order of the institution.  The size, complexity, and security level of the institution, the degree of sophistication of the inmates confined, and other variables require flexibility in correspondence procedures. All Wardens shall establish open general correspondence procedures.**

Open general correspondence privileges may be given to inmates who are able to exercise them responsibly.  Care should be taken during orientation and thereafter to help inmates understand their responsibility for open correspondence privileges.

**(b)  Staff shall inform each inmate in writing promptly after arrival at an institution of that institution's rules for handling of inmate mail.  This notice includes the following statement:**

**The staff of each institution of the Bureau of Prisons has the authority to open all mail addressed to you before it is delivered to you.  "Special Mail" (mail from the President and Vice President of the U.S., attorneys, Members of the U.S. Congress, Embassies and Consulates, the U.S. Department of Justice (excluding the Bureau of Prisons but including U.S. Attorneys), other Federal law enforcement officers, State Attorneys General, Prosecuting Attorneys, Governors, U.S. Courts (including U.S. Probation Officers), and State Courts) may be opened only in your presence to be checked for contraband.  This procedure occurs only if the sender is adequately identified on the envelope and the front of the envelope is marked "Special Mail — Open only in the presence of the inmate." Other mail may be opened and read by the staff.**

**If you do not want your *general* correspondence opened and read, the Bureau will return it to the Postal Service.  This means that you will not receive such mail. You may choose whether you want your general correspondence delivered to you subject to the above conditions, or returned to the Postal Service.  Whatever your choice, special mail will be delivered to you, after it is opened in your presence and checked for contraband.  You can make your choice by signing Part I or Part II.**

If the inmate elects not to have his/her general correspondence opened and read or refuses to sign the notice, a copy of the refusal is forwarded to the mail room (notice follows this section).

**Part I — General Correspondence to be Returned to the Postal Service**

**I have read or had read to me the foregoing notice regarding mail.  I do not want my general correspondence opened and read.  I REQUEST THAT THE BUREAU OF PRISONS RETURN MY GENERAL CORRESPONDENCE TO THE POSTAL SERVICE. I understand that special mail will be delivered to me, after it is opened in my presence and checked for contraband.**

**_____          _____          _____**
**(Name)                          (Reg. No.)              (Date)**

**Part II — General Correspondence to be Opened, Read, and Delivered**

**I have read or had read to me the foregoing notice regarding mail, I WISH TO RECEIVE MY GENERAL CORRESPONDENCE.  I understand that the Bureau of Prisons may open and read my general correspondence if I choose to receive same.  I also understand that special mail will be delivered to me, after it is opened in my presence and checked for contraband.**

**_____          _____          _____**
**(Name)                          (Reg. No.)              (Date)**

_____

**Inmate _____    _____, refused to sign this form.  He (she) was**
**          (NAME)        (REG. NO.)**
**advised by me that the Bureau of Prisons retains the authority to open and read all general correspondence.  The inmate was also advised that his (her) refusal to sign this form will be interpreted as an indication that he (she) wishes to receive general correspondence subject to the conditions in Part II above.**

**_____          _____**
**Staff Member's Signature                Date**

The above notice is included as part of the Acknowledgment of Inmate (BP-A0407).

**(c)  Staff shall inform an inmate that letters placed in the U.S. Mail are placed there at the request of the inmate and the inmate must assume responsibility for the contents of each letter.  Correspondence containing threats, extortion, etc., may result in prosecution for violation of federal laws.  When such material is discovered, the inmate may be subject to disciplinary action, the written material may be copied, and all material may be referred to the appropriate law enforcement agency for prosecution.**

**(d)  The inmate is responsible for filling out the return address completely on envelopes provided for the inmate's use by the institution.  If the inmate uses an envelope not provided by the institution, the inmate is responsible for ensuring that the envelope used contains all return address information listed on the envelope provided by the institution.**

All envelopes, whether preprinted envelopes ordered through UNICOR or written by the inmate, must have a return address with the:

- ■ Inmate's name.
- ■ Register number.
- ■ Name of the institution.

■ P.O. Box (or street address if there is no P.O. Box).
■ City, state, and ZIP code.

In addition, all outgoing mail, for institutions with a TRULINCS-generated mailing label system, must utilize these mailing labels on all outgoing correspondence, in accordance with the Program Statement **Trust Fund Limited Inmate Computer System (TRULINCS) — Electronic Messaging**. Consistent with this TRULINCS Program Statement, if an inmate fails to place the TRULINCS-generated label on outgoing postal mail, the mail is returned to the inmate for proper preparation.

5. **NOTIFICATION OF REJECTIONS**

**§ 540.13 Notification of rejections.**

**When correspondence is rejected, the Warden shall notify the sender in writing of the rejection and the reasons for the rejection. The Warden shall also give notice that the sender may appeal the rejection. The Warden shall also notify an inmate of the rejection of any letter addressed to that inmate, along with the reasons for the rejection and shall notify the inmate of the right to appeal the rejection. The Warden shall refer an appeal to an official other than the one who originally disapproved the correspondence. The Warden shall return rejected correspondence to the sender unless the correspondence includes plans for or discussion of commission of a crime or evidence of a crime, in which case there is no need to return the correspondence or give notice of the rejection, and the correspondence should be referred to appropriate law enforcement authorities. Also, contraband need not be returned to the sender.**

The Warden may not delegate the authority to reject correspondence or sign notification letters below the level of Associate Warden.

Section 6.d outlines the basis for determining whether correspondence should be rejected. Returned Correspondence (BP-A0327) is used to notify the involved parties of the rejection. "Nuisance" contraband is returned to the sender using Stamps, Negotiable Instrument & Other Returned to Sender (BP-A0328).

The Warden acknowledges receipt of an appeal from the sender of a rejected letter and designates the appropriate staff to respond. When the Warden makes the initial rejection, a subsequent appeal by a non-inmate sender is referred to the Regional Office.

If the Warden is doubtful about the propriety of an incoming or outgoing letter or has questions concerning the interpretation of regulations, he/she may refer the problem to the Regional Correctional Programs Administrator or the Regional Counsel. In case of rejection, the offending content is reproduced and retained for a reasonable period (at least 3 months), to have it available if the rejection is appealed.

6.  **GENERAL CORRESPONDENCE**

**§ 540.14 General correspondence.**

**(a)  Institution staff shall open and inspect all incoming general correspondence. Incoming general correspondence may be read as frequently as deemed necessary to maintain security or monitor a particular problem confronting an inmate.**

**(b)  Except for "special mail," outgoing mail from a pretrial inmate may not be sealed by the inmate and may be read and inspected by staff.**

**(c) (1)  Outgoing mail from a sentenced inmate in a minimum or low security level institution may be sealed by the inmate and, except as provided for in paragraphs (c)(1)(i) through (iv) of this section, is sent out unopened and uninspected.  Staff may open a sentenced inmate's outgoing general correspondence:**

**(i)  If there is reason to believe it would interfere with the orderly running of the institution, that it would be threatening to the recipient, or that it would facilitate criminal activity;**

**(ii)  If the inmate is on a restricted correspondence list;**

**(iii)  If the correspondence is between inmates (see § 540.17); or**

28 CFR § 540.17 refers to Section 9 of this Program Statement.

**(iv)  If the envelope has an incomplete return address.**

**(2)  Except for "special mail," outgoing mail from a sentenced inmate in a medium or high security level institution, or an administrative institution may not be sealed by the inmate and may be read and inspected by staff.**

See the Program Statement **Inmate Security Designation and Custody Classification** for identification of security levels.

(3)  **Mail Monitoring**.  Each institution establishes procedures for monitoring incoming and outgoing mail.  Institutions may wish to give closer scrutiny to incoming and outgoing mail of inmates, for example, who:

■   Participated in criminal activity of a sophisticated nature.
■   Committed crimes that involved mail or fraudulent schemes.
■   Are considered escape risks.

■    Present management problems (i.e., interference /disruption of the orderly running of the institution).

The staff member designated to supervise correspondence may keep a list of such inmates. Monitoring procedures may not interfere with mail handling.

(4)  **Reading and Inspection**.  As stated in this section, all incoming general correspondence and outgoing mail in medium, high, and administrative institutions (except "special mail") is subject to random reading by correctional staff.  The objectives of reading mail differ from the objectives of inspection.  For *inspection* (to which all incoming general correspondence is subjected), the objective is primarily to detect contraband.  The random *reading* of mail is intended to reveal, for example, escape plots, plans to commit illegal acts, plans to violate institution rules, or other security concerns.

(5)  **Disclosure**.  When reading correspondence, a staff member may incidentally learn information about the private lives of inmates or their correspondents.  Bureau staff must be sensitive to the fact that most information in correspondence is private, and must be handled discreetly.  Unless there is a legitimate correctional concern relating to security, safety, orderly running of the institution, criminal activity, or inmate rehabilitation, the contents of reviewed correspondence should not be revealed to any other person.

**(d)  The Warden may reject correspondence sent by or to an inmate if it is determined detrimental to the security, good order, or discipline of the institution, to the protection of the public, or if it might facilitate criminal activity. Correspondence which may be rejected by a Warden includes, but is not limited to, correspondence which contains any of the following:**

**(1)  Matter which is nonmailable under law or postal regulations;**

**(2)  Matter which depicts, describes, or encourages activities which may lead to the use of physical violence or group disruption;**

This includes any printed material individually identified as placing that inmate, another inmate, or staff at risk of assault or other safety concerns.

**(3)  Information of escape plots, of plans to commit illegal activities, or to violate Bureau rules or institution guidelines;**

**(4)  Direction of an inmate's business (See § 541.13, Prohibited Act No. 408).  An inmate, unless a pre-trial detainee, may not direct a business while confined.**

**This does not, however, prohibit correspondence necessary to enable an inmate to protect property and funds that were legitimately the inmate's at the time of commitment.  Thus, for example, an inmate may correspond about refinancing an**

**existing mortgage or sign insurance papers, but may not operate a mortgage or insurance business while in the institution.**

§ 541.13, Prohibited Act No. 408, refers to Chapter 4 of the Program Statement **Inmate Discipline and Special Housing Units**.

**(5)  Threats, extortion, obscenity, or gratuitous profanity;**

**(6)  A code;**

**(7)  Sexually explicit material (for example, personal photographs) which by its nature or content poses a threat to an individual's personal safety or security, or to institution good order; or**

Nude or sexually suggestive photos (individual prints or copies as opposed to those from publications) present a special concern for personal safety, security, and good order.  This is particularly true when the subject is an inmate's relative, friend, or acquaintance.  For these reasons, ordinarily an inmate is not permitted to receive through the mail a personal photograph in which the subject is nude, displays genitalia or female breasts, or when the photo depicts sexual suggestive acts such as intercourse, fellatio, or sodomy.

The exclusion of this or similar materials is determined by whether it would be detrimental to an individual's safety or security, or to institution good order, if it were in the inmate's possession.  For purposes of this section, clippings from publications are considered correspondence.  For the rule on publications, see the Program Statement **Incoming Publications**.

**(8)  Contraband.  (See § 500.1 of this chapter.  A package received without prior authorization by the Warden is considered to be contraband.)**

28 CFR 500.1 is contained in Section 2.d. of this Program Statement.

Multiple copies of printed materials intended for inmate distribution and third-party mailing are also considered contraband.

7.    **RESTRICTED GENERAL CORRESPONDENCE**

**§ 540.15 Restricted general correspondence.**

**(a)  The Warden may place an inmate on restricted general correspondence based on misconduct or as a matter of classification.**

For this restriction, the term "classification" is used to identify categories of behavior.

**Determining factors include the inmate's:**

**(1)  Involvement in any of the activities listed in § 540.14(d);**

28 CFR § 540.14(d) is contained in Section 6.d. of this Program Statement.

**(2)  Attempting to solicit funds or items (e.g., samples), or subscribing to a publication without paying for the subscription;**

**(3)  Being a security risk;**

**(4)  Threatening a government official; or**

**(5)  Having committed an offense involving the mail.**

**(b)  The Warden may limit to a reasonable number persons on the approved restricted general correspondence list of an inmate.**

A recommendation to place an inmate on restricted correspondence is made by the unit team during the inmate's program review or by the Unit Disciplinary Committee (UDC) or Disciplinary Hearing Officer (DHO), when restricted correspondence is required by an infraction of an institution rule.

Action taken by the UDC or DHO as a disciplinary sanction is ordinarily based on a finding of violation of correspondence regulations.

**(c)  The Warden shall use one of the following procedures before placing an inmate on restricted general correspondence.**

**(1)  Where the restriction will be based upon an incident report, procedures must be followed in accordance with inmate disciplinary regulations (part 541, subpart B of this chapter).**

Part 541, subpart B, refers to the Program Statement **Inmate Discipline and Special Housing Units**.

**(2)  Where there is no incident report, the Warden:**

**(i)  Shall advise the inmate in writing of the reasons the inmate is to be placed on restricted general correspondence;**

**(ii)  Shall give the inmate the opportunity to respond to the classification or change in classification; the inmate has the option to respond orally or to submit written information or both; and**

**(iii)  Shall notify the inmate of the decision and the reasons, and shall advise the inmate that the inmate may appeal the decision under the Administrative Remedy Procedure.**

**(d)  When an inmate is placed on restricted general correspondence, the inmate may, except as provided in §§ 540.16 and 540.17:**

28 §§ CFR 540.16 and 540.17 refer to Sections 8 and 9, respectively, of this Program Statement.

**(1)  Correspond with the inmate's spouse, mother, father, children, and siblings, unless the correspondent is involved in an violation of correspondence regulations, or would be a threat to the security or good order of the institution;**

The word "spouse" includes a common-law relationship which has previously been established in a state which recognizes this status.  In states that do not, a common-law relationship is not considered "immediate family."  For determination of applicable state laws, consult the Regional Counsel.

**(2)  Request other persons also to be placed on the approved correspondence list, subject to investigation, evaluation, and approval by the Warden; with prior approval, the inmate may write to a proposed correspondence to obtain a release authorizing an investigation; and**

**(3)  Correspond with former business associates, unless it appears to the Warden that the proposed correspondent would be a threat to the security or good order of the institution, or that the resulting correspondence could reasonably be expected to result in criminal activity.  Correspondence with former business associates is limited to social matters.**

**Verification Procedures**.  Each year it becomes more difficult to obtain information from law enforcement agencies on proposed correspondents.  For this reason, staff attempt to secure information from other sources, including the inmate, the proposed correspondent, and the U.S. Probation Officer.  Each institution develops its own verification procedures, depending on the sophistication of its inmates and resources for verification.

A release from the individual in question may be necessary (for example, under the Privacy Act) to complete the investigation.  If a release is needed, the inmate is responsible for obtaining it, and is permitted to write to the correspondent for this purpose.

**(e)  The Warden may allow an inmate additional correspondence with persons other than those on the inmate's approved mailing list when the correspondence is shown to be necessary and does not require an addition to the mailing list because it is not of an ongoing nature.**

8.  **INMATE CORRESPONDENCE WHILE IN SEGREGATION AND HOLDOVER STATUS**

**§ 540.16 Inmate correspondence while in segregation and holdover status.**

**(a)  The Warden shall permit an inmate in holdover status (i.e., enroute to a designated institution) to have correspondence privileges similar to those of other inmates insofar as practical.**

**(**b**)  The Warden shall permit an inmate in segregation to have full correspondence privileges unless placed on restricted general correspondence under § 540.15.**

28 CFR § 540.15 refers to Section 7 of this Program Statement.

9.  **CORRESPONDENCE BETWEEN CONFINED INMATES**

**§ 540.17 Correspondence between confined inmates.**

**An inmate may be permitted to correspond with an inmate confined in any other penal or correctional institution if the other inmate is either a member of the immediate family, or is a party or witness in a legal action in which both inmates are involved.  Such correspondence may be approved in other exceptional circumstances, with particular regard to the security level of the institution, the nature of the relationship between the two inmates, and whether the inmate has other regular correspondence.  The following additional limitations apply:**

Inmates must provide current documentation (dated within the past six months) to support both inmates are parties to or a witness in a current legal action.  At subsequent inmate team reviews, inmates will provide supporting documentation to continue correspondence privileges.

**(a)  Such correspondence at institutions of all security levels may always be inspected and read by staff at the sending and receiving institutions (it may not be sealed by the inmate); and**

If inspection of the correspondence reveals communication other than a legal matter, the unit manager will be advised and a determination will be made whether to disapprove further correspondence.  If privileges are rescinded, the unit manager or designee will ensure mail room and trust fund staff are notified.

**(b)  (1)  The appropriate unit manager at each institution must approve of the correspondence if both inmates are housed in Federal institutions and both inmates are members of the same immediate family or are a party or witness in a legal action in which both inmates are involved.**

The Warden is appraised of unusual circumstances pertaining to a request (e.g., inmates who have Central Inmate Monitoring assignments and/or disruptive group members) to correspond, for members of the same immediate family or for inmates who are a party or witness in the same legal action, for inmates housed in federal facilities.

Normally, the approval of mail correspondence privileges will apply to electronic messages generated via TRULINCS. The approval of correspondence privileges for both inmates will remain in effect even if either is transferred within the Bureau. The unit team will forward a copy of the approved mail correspondence to the mail room and trust fund staff for processing.

Unit team staff will review the status of previously approved correspondence during the inmate's classification/program review. When denying an inmate's request to correspond with immediate family, the unit manager will document the reason(s) for the denial.

**(2) The Wardens of both institutions must approve of the correspondence if one of the inmates is housed at a non-Federal institution or if approval is being granted on the basis of exceptional circumstances.**

The Warden documents a denial or the rationale for approving the request for an inmate to correspond with an inmate, who is an immediate family member or a party or witness in the same legal action, housed in a non-federal facility/contract facility.

The approval of correspondence privileges for the inmate will remain in effect even when the inmate transfers within the Bureau. Unit team will review previously approved correspondence for either of the above circumstances. Unit team will forward a copy of the approval for mail correspondence to mail room staff.

10. **SPECIAL MAIL**

**§ 540.18 Special mail.**

**(a) The Warden shall open incoming special mail only in the presence of the inmate for inspection for physical contraband and the qualification of any enclosures as special mail. The correspondence may not be read or copied if the sender is adequately identified on the envelope, and the front of the envelope is marked "Special Mail — Open only in the presence of the inmate".**

Incoming mail meeting these requirements must be treated per this rule. The Warden may, however, treat incoming mail that does not meet all requirements for special mail handling in the same fashion as special mail, including opening it in the inmate's presence and inspecting it only for contraband. For example, mail from the chambers of a Federal judge or from a Member of Congress should be given special handling even if it does not have a special mail marking on the envelope.

Similarly, mail from an adequately identified sender that contains markings similar to the phrase "Special Mail — Open only in the presence of the inmate" may be given special handling. Examples of similar markings include "Attorney-Client — Open only in the presence of the inmate" and "Legal Mail — Open only in the presence of the inmate."

**(b)  In the absence of either adequate identification or the "special mail" marking indicated in paragraph (a) of this section appearing on the envelope, staff may treat the mail as general correspondence and may open, inspect, and read the mail.**

**(c)  (1) Except as provided for in paragraph (c)(2) of this section, outgoing special mail may be sealed by the inmate and is not subject to inspection.**

**(2)  Special mail shall be screened in accordance with the provisions of paragraph (c)(2)(iii) of this section when the special mail is being sent by an inmate who has been placed on restricted special mail status.**

**(i)  An inmate may be placed on restricted special mail status if the Warden, with the concurrence of the Regional Counsel, documents in writing that the special mail either has posed a threat or may pose a threat of physical harm to the recipient (e.g., the inmate has previously used special mail to threaten physical harm to a recipient).**

**(ii)  The Warden shall notify the inmate in writing of the reason the inmate is being placed on restricted special mail status.**

**(iii)  An inmate on restricted special mail status must present all materials and packaging intended to be sent as special mail to staff for inspection.  Staff shall inspect the special mail material and packaging, in the presence of the inmate, for contraband.  If the intended recipient of the special mail has so requested, staff may read the special mail for the purpose of verifying that the special mail does not contain a threat of physical harm.  Upon completion of the inspection, staff shall return the special mail material to the inmate if the material does not contain contraband, or contain a threat of physical harm to the intended recipient. The inmate must then seal the special mail material in the presence of staff and immediately give the sealed special mail material to the observing staff for delivery.  Special mail determined to pose a threat to the intended recipient shall be forwarded to the appropriate law enforcement entity.  Staff shall send a copy of the material, minus the contraband, to the intended recipient along with notification that the original of the material was forwarded to the appropriate law enforcement entity.**

**(iv)  The Warden shall review an inmate's restricted special mail status at least once every 180 days.  The inmate is to be notified of the results of this review.  An**

**inmate may be removed from restricted special mail status if the Warden determines, with the concurrence of the Regional Counsel, that the special mail does not threaten or pose a threat of physical harm to the intended recipient.**

**(v)  An inmate on restricted mail status may seek review of the restriction through the Administrative Remedy Program.**

**(d)  Except for special mail processed in accordance with paragraph (c)(2) of this section, staff shall stamp the following statement directly on the back side of the inmate's outgoing special mail:**

**"The enclosed letter was processed through special mailing procedures for forwarding to you.  The letter has neither been opened nor inspected.  If the writer raises a question or problem over which this facility has jurisdiction, you may wish to return the material for further information or clarification.  If the writer encloses correspondence for forwarding to another addressee, please return the enclosure to the above address."**

The stamp includes the above statement, the name and address of the institution and space for the date.

## 11.  LEGAL CORRESPONDENCE

**§ 540.19 Legal correspondence.**

**(a)  Staff shall mark each envelope of incoming legal mail (mail from courts or attorneys) to show the date and time of receipt, the date and time the letter is delivered to an inmate and opened in the inmate's presence, and the name of the staff member who delivered the letter.  The inmate may be asked to sign as receiving the incoming legal mail.  This paragraph applies only if the sender has marked the envelope as specified in § 540.18.**

28 CFR § 540.18 refers to Section 10 of this Program Statement.

Staff are expected to develop a master log containing the above information.  The inmate may be requested (but not required) to sign the log, indicating receipt of the legal mail.  If the inmate refuses, staff note this in the log.

**(b)  The inmate is responsible for advising any attorney that correspondence will be handled as special mail only if the envelope is marked with the attorney's name and an indication that the person is an attorney, and the front of the envelope is marked "Special Mail — Open only in the presence of the inmate".**

**Legal mail shall be opened in accordance with special mail procedures (see § 540.18).**

28 CFR § 540.18 refers to Section 10 of this Program Statement.

**(c)  Grounds for the limitation or denial of an attorney's correspondence rights or privileges are stated in part 543, subpart B.  If such action is taken, the Warden shall give written notice to the attorney and the inmate affected.**

Part 543, subpart B, refers to the Program Statement **Inmate Legal Activities**.

Any violation of the attorney/client correspondence privilege is referred to Regional Counsel, who, in conjunction with the Office of General Counsel, may restrict the inmate or attorney from further correspondence privileges.

**(d)  In order to send mail to an attorney's assistant or to a legal aid student or assistant, an inmate shall address the mail to the attorney or legal aid supervisor, or the legal organization or firm, to the attention of the student or assistant.**

See the Program Statement **Inmate Legal Activities** for information concerning Bureau recognition of an attorney's assistant or legal aid student assistant.

**(e)  Mail to an inmate from an attorney's assistant or legal aid student or assistant, in order to be identified and treated by staff as special mail, must be properly identified on the envelope as required in paragraph (b) of this section, and must be marked on the front of the envelope as being mail from the attorney or from the legal aid supervisor.**

12.  **INMATE CORRESPONDENCE WITH REPRESENTATIVES OF THE NEWS MEDIA**

**§ 540.20 Inmate correspondence with representatives of the news media.**

**(a)  An inmate may write through "special mail" to representatives of the news media specified by name or title (see § 540.2(b)).**

28 CFR § 540.2(b) refers to Section 2.b. of this Program Statement.

Properly identified and labeled correspondence from an inmate who is not on restricted mail status to qualifying news media representatives is sealed and forwarded without inspection, directly and promptly.  Properly identified and labeled correspondence from an inmate on restricted special mail status is also sealed and forwarded promptly, but may be subject to inspection per procedures in Section 10.  If there is doubt whether a representative qualifies, contact the Public Information Officer in the Central Office.

**(b)  The inmate may not receive compensation or anything of value for correspondence with the news media.  The inmate may not act as reporter.**

**(c)  Representatives of the news media may initiate correspondence with an inmate.  Staff shall open incoming correspondence from representatives of the media and inspect for contraband, for its qualification as media correspondence, and for content which is likely to promote either illegal activity or conduct contrary to Bureau regulations.**

See the Program Statement **News Media Contacts** on other aspects of contact with news media.

13.  **PAYMENT OF POSTAGE**

**§ 540.21 Payment of postage.**

**(a)  Except as provided in paragraphs (d), (e), (f), and (i) of this section, postage charges are the responsibility of the inmate.  The Warden shall ensure that the inmate commissary has postage stamps available for purchase by inmates.**

Mail room staff should obtain postage rate charts from the local servicing post office and place them where inmates ordinarily have access — the mail room or housing units.

(1)  **Postage Sold by Commissary**.  The inmate commissary must have available sufficient stamp denominations to allow mailing letters in excess of 1 ounce, but not requiring an additional first-class stamp.

(2)  **Purchase Limitation**.  The Warden issues local guidelines, which ordinarily limit an inmate's commissary purchase per visit to 20 postage stamps (denomination for first-class, domestic, 1-ounce mailing), or the equivalent; if such visits are limited to once per week or less, the Warden may authorize an additional purchase of stamps.

(3)  **Inmate Possession of Postage Stamps**.  The Warden issues local guidelines, limiting an inmate's possession of stamps at one time to no more than 60 (denomination for first-class, domestic, 1-ounce mailing), or the equivalent.  The Warden may authorize possession of stamps to a specified amount in excess of this limit.  The stamps are to be maintained by the inmate in the same manner the stamps are sold or in the manner provided by the unit manager.

(4)  **Approval for Additional Purchases**.  An inmate may be authorized to purchase (per commissary visit) more than 20 postage stamps (denomination for first-class, domestic, 1-ounce mailing), or the equivalent, only upon approval of the associate warden.  This authority may not be delegated below unit manager.

**(b)  Writing paper and envelopes are provided at no cost to the inmate.  Inmates who use their own envelopes must place a return address on the envelope (see § 540.12(d)).**

28 CFR § 540.12(d) refers to Section 4(d) of this Program Statement.

**(c)  Inmate organizations will purchase their own postage.**

**(d)  An inmate who has neither funds nor sufficient postage and who wishes to mail legal mail (includes courts and attorneys) or Administrative Remedy forms will be provided the postage stamps for such mailing.  To prevent abuses of this provision, the Warden may impose restrictions on the free legal and administrative remedy mailings.**

(1)  To prevent abuses of Bureau directives regarding purchase of postage, Wardens will:

■  Provide an inmate who has neither funds nor postage up to five postage stamps (denomination for first-class, domestic, 1-ounce mailing) or the equivalent each week, for legal mail or Administrative Remedy filing
■  Require an inmate who has, for at least two separate months, depleted his/her commissary account, obtained Government-paid postage stamps, and then restored money to the account to complete the form for reimbursement Request for Withdrawal of Inmate's Personal Funds (BP-199) for the amount of postage given for legal mail or Administrative Remedy filings.  Commissary staff hold the BP-199 and charge it against the inmate's account as soon as he/she has funds (see the Program Statement **Trust Fund Management Manual**).
■  Allow an inmate to purchase sufficient postage for legal mail or Administrative Remedy mailings.  The amount may not exceed the limit for postage purchases.

(2)  The associate warden makes a final determination whether the inmate is to receive postage under the conditions of this subsection.  An "inmate without funds" means an inmate without sufficient commissary balance to purchase a postage stamp sufficient for first-class, 1-ounce domestic mailing.  This authority may not be delegated below unit manager.

**(e)  When requested by an inmate who has neither funds nor sufficient postage, and upon verification of this status by staff, the Warden shall provide the postage stamps for mailing a reasonable number of letters at government expense to enable the inmate to maintain community ties.  To prevent abuses of this provision, the Warden may impose restrictions on the free mailings.**

Five letters per month are suggested as reasonable in most circumstances.  To prevent abuses, the Warden may require reimbursement as provided in Section 13(d)(1).  The associate warden (not to be delegated below unit manager) makes a final determination on whether the inmate is to receive postage under this subsection.

In making this determination, an "inmate without funds" means an inmate without sufficient commissary balance to purchase a postage stamp sufficient for first-class, 1-ounce domestic mailing, or postage for half-ounce international air mail for an inmate whose community ties require foreign correspondence.

**(f)  Mailing at government expense is also allowed for necessary correspondence in verified emergency situations for inmates with neither funds nor sufficient postage.**

The associate warden makes a final determination whether the inmate is to receive postage stamps under this subsection.  This authority may not be delegated below unit manager.

**(g)  Inmates must sign for all stamps issued to them by institution staff.**

A separate log is kept for this purpose.

**(h)  Mail received with postage due is not ordinarily accepted by the Bureau of Prisons.**

The mail room staff refuses postage-due mail.  However, if such mail is tendered to mail room staff without collection of postage due, it is processed without further collection action (see the **Mail Management Manual**).

**(i)  Holdovers and pre-trial commitments will be provided a reasonable number of stamps for the mailing of letters at government expense.**

Three letters per week is suggested as reasonable in most circumstances.  Commissary purchase of postage is also available to pretrial inmates.  For holdovers, additional Government-furnished postage stamps may be allowed for special needs demonstrated by the inmate.

**(j)  Inmates may not be permitted to receive stamps or stamped items (e.g., envelopes embossed with stamps, postal cards with postage affixed) other than by issuance from the institution or by purchase from commissary.**

Stamps and stamped items sent into the institution are returned to the sender.  Indicate the reason for return on Form BP-A0328, Stamps, Negotiable Instrument & Other Returned to Sender.  A copy of the form is placed with the correspondence for delivery to the inmate.  See the **Mail Management Manual** for further information.

k.  The institution's business manager is responsible for the purchase and security of stamps purchased by the Bureau for issue to inmates per Section 13.d.  The business manager also conducts quarterly audits.

14.  **SPECIAL POSTAL SERVICES**

**§ 540.22  Special postal services.**

The information in this section was extracted from the **Mail Management Manual**.  See that policy for more detailed information.

**(a)  An inmate, at no cost to the government, may send correspondence by registered, certified, or insured mail, and may request a return receipt.**

**(b)  An inmate may insure outgoing personal correspondence (e.g., a package containing the inmate's hobbycrafts) by completing the appropriate form and applying sufficient postage.**

The Request Authorization to Mail Inmate Package (BP-329) form is used.

**(1)  In the event of loss or damage, any claim relative to this matter is made to the U.S. Postal Service, either by the inmate or the recipient.  The U.S. Postal Service will only indemnify a piece of insured mail for the actual value of an item, regardless of declared value.**

When an inmate decides that a claim is necessary for an incoming piece of insured mail, he/she is advised that the mailer is the most appropriate person to file the claim with the U.S. Postal Service.

**(2)  Inmate packages forwarded as a result of institution administration are considered official mail, except as otherwise specified (for example, hobbycraft articles mailed out of the institution).  Official mail is not insured.  If such an item is subsequently lost or damaged in the mail process the inmate may file a tort claim with the Bureau of Prisons (see part 543, subpart C of this chapter).**

Such packages are forwarded as official mail at Government expense.  If documentation indicates that the package left Bureau control and was lost or damaged by the U.S. Postal Service (or mailed via a contract mail provider), the inmate is instructed to file a tort claim with the U.S. Postal Service (or directly with the contract mail provider) (see the Program Statement **Federal Tort Claims Act**).  Hobbycraft articles are discussed in the Program Statement **Inmate Recreation Programs**.

**(c)  Certified mail is sent first class at the inmate's expense.**

The inmate must pay basic postage, costs of certification, and costs of a return receipt (if requested).

**(d)  An inmate may not be provided such services as express mail, COD, private carriers, or stamp collecting while confined.**

## 15.   INMATE FUNDS RECEIVED THROUGH THE MAILS

**§ 540.23 Inmate funds received through the mails.**

**Except as provided for in part 506 of this chapter, funds enclosed in inmate correspondence are to be rejected.  Deposits intended for the inmate's commissary account must be mailed directly to the centralized commissary account (see 28 CFR part 506).**

Section 2 of the Acknowledgment of Inmate, Part 1 & 2 (BP-A0407) contains an authorization for disposition of funds.  The inmate ordinarily completes this form upon initial entry into Bureau custody.  Negotiable instruments must include the inmate's full name and register number.

Negotiable instruments received through the mail enclosed in inmate correspondence are rejected using the Stamps, Negotiable Instrument and Other Returned to Sender form (BP-A0328).

Inmates are not permitted to receive unsolicited funds through the mail, nor are inmates permitted to solicit funds or initiate requests for funds other than from family and friends.

b. Staff should be alert to unusual activity concerning funds received for posting to an inmate's account or being mailed out of the institution.  For example, accounting technicians, unit staff and others should notify the unit manager when an inmate receives a large amount of money either in a lump sum or over a short period of time or has unusual activity in his/her account.  The unit manager determines whether an appropriate reason exists for such activity or if a referral to the captain is necessary.

## 16.   RETURNED MAIL

**§ 540.24 Returned mail.**

**Staff shall open and inspect for contraband all undelivered mail returned to an institution by the Post Office before returning it to the inmate.  The purpose of this inspection is to determine if the content originated with the inmate sender identified on the letter or package; to prevent the transmission of material, substances, and property which an inmate is not permitted to possess in the institution; and to determine that the mail was not opened or tampered before its return to the institution.  Any remailing is at the inmate's expense.  Any returned mail qualifying as "special mail" is opened and inspected for contraband in the inmate's presence.**

17.  **CHANGE OF ADDRESS AND FORWARDING OF MAIL FOR INMATES**

**§ 540.25 Change of address and forwarding of mail for inmates.**

**(a)  Staff shall make available to an inmate who is being released or transferred appropriate Bureau of Prisons and U.S. Postal Service forms for change of address.**

A U.S. Postal Service "Change of Address" kit is made available to each inmate being transferred to notify correspondents.  (**Note**:  The "kit" is a notice to publishers, businesses, correspondents, etc.; it is **not** a notification to the U.S. Postal Service.)  Staff obtain supplies of these kits from the servicing U.S. postal facility.  Kits are kept in Receiving and Discharge and the mail room for inmates leaving the institution.

**(b)  Inmates are responsible for informing their correspondents of a change of address.**

**(c)  Postage for mailing change of address cards is paid by the inmate**.

**(d)  Except as provided in paragraphs (e) through (g) of this section, all mail received for a released or transferred inmate will be returned to the U.S. Postal Service for disposition in accordance with U.S. Postal Service regulations.**

**(e)  Staff shall use all means practicable to forward special mail.**

The Program Statement **Mail Management Manual** provides more detailed instructions on forwarding inmate special mail.

**(f)  Staff shall forward inmate general correspondence to the new address for a period of 30 days.**

Inmate general mail (as opposed to special mail) is forwarded to the new address for 30 days. General mail is forwarded to the address in the SENTRY database.  After 30 days, general mail is returned to the sender with the notation "Not at this address — return to sender."

**(g)  Staff shall permit an inmate released temporarily on writ to elect either to have general correspondence held at the institution for a period not to exceed 30 days, or returned to the U.S. Postal Service for disposition.**

Use the form Disposition of General Correspondence While Inmate is Released Temporarily on Writ (BP-A0398).

**(1)  If the inmate refuses to make this election, staff at the institution shall document this refusal, and any reasons, in the inmate's central file.  Staff shall**

**return to the U.S. Postal Service all general correspondence received for such as inmate after the inmate's departure.**

Document the refusal on the Disposition of General Correspondence While Inmate is Released Temporarily on Writ (BP-A0398).

**(2)  If the inmate does not return from writ within the time indicated, staff shall return to the U.S. Postal Service all general correspondence being held for that inmate for disposition in accordance with postal regulations.**

18.   **INSTITUTION SUPPLEMENT**

Each institution must update its Institution Supplement (IS) and forward a copy to the Regional Correctional Programs Administrator.  The IS includes:

- Designation of a staff member to supervise inmate correspondence.
- Procedures for monitoring incoming and outgoing mail, including inspection and reading mail, especially to and from particular inmates.
- Use of a master log to note receipt and inmate acknowledgment of incoming legal mail.
- Limitations on the amount of postage stamps an inmate may possess and single purchases of stamps.
- Restrictions on free legal and administrative remedy mailings.

**REFERENCES**

*Program Statements*
P1315.07       Legal Activities, Inmate (11/5/99)
P1320.06       Federal Tort Claims Act (8/1/03)
P1330.16       Administrative Remedy Program (12/31/07)
P1480.05       News Media Contacts (9/21/00)
P4500.07       Trust Fund/Deposit Fund Manual (4/19/10)
P5100.08       Inmate Security Designation and Custody Classification (9/12/06)
P5265.13       Trust Fund Limited Inmate Computer System (TRULINCS)
                   — Electronic Messaging (2/19/09)
P5266.10       Incoming Publications (1/10/03)
P5270.08       Inmate Discipline and Special Housing Units (12/4/09)
P5370.11       Recreation Programs, Inmate (6/28/08)
P5800.16       Mail Management Manual (4/5/11)
P5800.15       Correctional Systems Manual (1/01/09)
P7331.04       Pretrial Inmates (1/31/03)

*Federal Regulations*
Federal Regulations cited in this Program Statement are contained in 28 CFR part 540.

*ACA Standards*
- 2nd Edition Standards for Administration of Correctional Agencies:  2-CO-5D-01
- 4th Edition Standards for Adult Correctional Institutions:  4-4266, 4-4275, 4-4279, 4-4487, 4-4488, 4-4489, 4-4491, 4-4492 and 4-4496
- 4th Edition Standards for Adult Local Detention Facilities:  4-ALDF-2A-60, 4-ALDF-6A-02, 4-ALDF-6A-04, 4-ALDF-5B-05, 4-ALDF-5B-06, 4-ALDF-5B-08 and 4-ALDF-5B-09

*Records Retention Requirements*
Requirements and retention guidance for records and information applicable to this program are available in the Records and Information Disposition Schedule (RIDS) on Sallyport.



**U.S. Department of Justice**
Federal Bureau of Prisons

P R O G R A M   S T A T E M E N T
OPI:              CPD/CPB
NUMBER:     5800.16
DATE:            April 5, 2011

# Mail Management Manual

/s/
*Approved*: Harley G. Lappin
Director, Federal Bureau of Prisons

1.  **PURPOSE AND SCOPE**

To implement procedures for processing all official and inmate mail as expeditiously and economically as possible.

a.  **Program Objectives.** The expected result of this program is:

Official and inmate mail will be processed expeditiously and efficiently.

b.  **Summary of Changes**. This edition of the Program Statement incorporates changes that have occurred since the last publication of this policy and initiatives as a result of the Reduction and Elimination of Duties Management Assessment Project (REDMAP) initiatives.

*Policy Rescinded*
P5800.10                              Mail Management Manual (11/3/95)

■  Procedures contained in Operations Memorandum 004-2008 (5800), Inmate Certified Mail Procedures, were included in this Program Statement in Section 4.9.   These procedures require mail room staff, and unit staff if applicable, at each institution to maintain an incoming inmate certified mail log documenting all incoming inmate certified mail.   It also establishes the minimum required information that will be documented in the log.
■  Section 5.6 gives information on filing claims with United Parcel Service (UPS).
■  Inmate funds received through the mail will be rejected.   The sender is required to mail funds intended for an inmate commissary account directly to the National Lockbox.

- Pre-Sentence Investigation Reports and Statement of Reason received through the mail will be rejected.
- Eliminated outgoing special/legal mail drop-boxes.
- Eliminated the requirement to forward copies of correspondence related to local mail handling issues to Regional and Central Office Correctional Programs Administrators.
- Eliminated the requirement to maintain a log for postal meter resets documenting the date, amount of reset, and signature of staff member requesting the reset.
- Eliminated use of the national lockbox instruction form letter for the rejection of negotiable instruments by consolidating the instruction form and the BP-A0328, Stamps, Negotiable Instruments & Other Returned to Sender form.

c.  **Pretrial, Holdover, and Detainee Procedures**.   The procedures in this Program Statement apply to pretrial and detainee inmates.

d.  **Institution Supplement**.   Many requirements of this Manual are security level-related and are affected by local requirements.   Each institution will establish an Institution Supplement which will be submitted to the Correctional Programs Administrator for review.   It must address, but is not limited to, the following topics:

- Delivery and collection of mail (including special mail) for inmates who do not have ready access to these services.
- Distribution of official mail.
- Delivery of inmate mail to housing units.
- Allowance for receipt of publications.
- Procedures for processing legal and special mail, to include packages.
- Processing mail into and out of special units (e.g., protective custody units).
- Procedures to notify the mail room of inmates who are enrolled in approved education programs.

**The Institution Supplement must be submitted for approval to the appropriate Regional Correctional Programs Administrator.**

2.8.  **DISTRIBUTION**

Each institution may also provide a courtesy copy of this Program Statement and the Institution Supplement to its local servicing post office.

**REFERENCES**

*Program Statements*
P1240.05       Records and Information Management Programs (9/21/00)
P1320.06       Federal Tort Claims Act (8/1/03)
P4500.07       Trust Fund/Deposit Fund Manual (4/19/10)

| | |
|---|---|
| P5265.14 | Correspondence (4/5/11) |
| P5265.13 | Trust Fund Limited Inmate Computer System (TRULINCS) –   Electronic Messaging (2/19/09) |
| P5266.10 | Publications, Incoming (1/10/03) |
| P5580.07 | Inmate Personal Property (12/28/05) |
| P5800.12 | Receiving and Discharge Manual (8/17/98) |
| P5800.15 | Correctional Systems Manual (1/1/09) |

United States Postal Service Domestic Mail Manual

*ACA Standards*

- 2nd   Edition Standards for Administration of Correctional Agencies: 2-CO-5D-01.
- 4th Edition Standards for Adult Correctional Institutions: 4-4266, 4-4285, 4-4429, 4-4446, 4-4487, 4-4488, 4-4489, 4-4490, 4-4491, 4-4492, 4-4493, 4-4494, 4-4495, and 4-4496.
- 4th Edition Standards for   Adult Local Detention Facilities: 4-ALDF-2A-60, 4-ALDF-5B-05, 4-ALDF-5B-06, 4-ALDF-5B-07, 4-ALDF-5B-08, 4-ALDF-5B-09, 4-ALDF-5B-10, 4-ALDF-5B-18, and 4-ALDF-6B-05.

*Records Retention Requirements*

Requirements and retention guidance for records and information applicable to this program are available in the Records and Information Disposition Schedule (RIDS) on Sallyport.

## CONTENTS

## Chapter 1.   General

1.1   Introduction  ..................................................................................................7
1.2   Supervisory Staff ...........................................................................................7
1.3   Mail Room Security ........................................................................................7
1.4   Schedule of Operations ..................................................................................8
1.5   Publications and Requests for Guidance .........................................................8
1.6   Equipment .....................................................................................................9
1.7   Types of Mail ...............................................................................................10
          a. Official Mail .......................................................................................10
          b. Inmate Correspondence......................................................................10
          c. Packages ............................................................................................10
1.8   Staff Personal Mail.......................................................................................11
1.9   Occupant or Current Addressee Mail ...........................................................11
1.10  Authority for Disposal of Mail .....................................................................11
1.11  Private Carriers ...........................................................................................11
1.12  Mandatory Opening and Inspecting of All Mail and Packages .........................11

## Chapter 2.   Official Mail

2.1   Payment for Mailings ...................................................................................13
2.2   Use of Postage Meters .................................................................................13
2.3   Prohibited Metering .....................................................................................13
2.4   UNICOR Postage .........................................................................................13
2.5   Payment of Postage by Government ..............................................................13
2.6   Business Reply Mail......................................................................................13
2.7   Obtaining Official Mail Supplies ...................................................................14
2.8   Official Mail Stations ...................................................................................15
2.9   Forwarding Official Mail ..............................................................................15
2.10  Inmate Packages As Official Mail .................................................................15
2.11  Official Mail Processing ...............................................................................15
          a.   Incoming Mail ..................................................................................15
          b.   Negotiable Instruments.....................................................................15
          c.   Official Mail Packages ......................................................................15
          d.   Outgoing Mail ..................................................................................15

## Chapter 3.   Inmate Mail

3.1   General ........................................................................................................17
3.2   Acknowledgment of Inmate (BP-A0407) .......................................................17
3.3   Inmate Services Available...........................................................................18

3.4    Processing Incoming Inmate Mail ....................................................................18
3.5    Mail Returned to Inmate. ...............................................................................19
3.6    Examination ....................................................................................................20
3.7    Delivery ..........................................................................................................20
3.8    Special Mail ....................................................................................................20
3.9    In/Out Processing Requirements for Special and Legal Mail ........................21
3.10   Incoming Depository at FDC/MCC/MDC's ..................................................23
3.11   Incoming Publications ....................................................................................23
3.12   Negotiable Instruments ..................................................................................23
3.13   Inmate Package Mail – Incoming ..................................................................24
3.14   Unauthorized Material and Contraband .........................................................26
3.15   Rejected Correspondence ...............................................................................28
3.16   Outgoing Inmate Letter Mail. ........................................................................28
3.17   Inmate Packages – Outgoing .........................................................................29
         a.   Outgoing Personal Packages ..............................................................29
         b.   Contraband .........................................................................................30
         c.   International Mailing of Packages at Inmate's Expense .....................30
         d.   Outgoing Official Packages ...............................................................30
         e.   International Mailing of Property Packages ........................................30
3.18   Forwarding Inmate General Mail ...................................................................30


**Chapter 4.   Special Postal Services**

4.1    COD ("Cash on Delivery") Services ..............................................................32
4.2    Postage Due Mail ...........................................................................................32
4.3    Express Mail Service — Staff Official Mail .................................................. 32
4.4    Registered Mail — Staff Official Mail ..........................................................33
4.5    Registered Mail — Inmate Use ......................................................................33
4.6    Insured Mail — Incoming ..............................................................................33
4.7    Insured Mail — Outgoing ..............................................................................33
4.8    Certified Mail — Staff Official ......................................................................34
         a.   Incoming Mail  ...................................................................................34
         b.   Outgoing Mail ....................................................................................34
4.9    Certified Mail — Inmate Use .........................................................................34
         a.   Incoming Mail ....................................................................................34
         b.   Incoming Certified Mail Log ..............................................................34
         c.   Unit Certified Mail Log ......................................................................35
4.10   Forwarding or Returning Inmate Certified Mail ...........................................35
4.11   Box Services ...................................................................................................36
4.12   Mail Imprints ..................................................................................................36
4.13   United Parcel Service (UPS) ..........................................................................36
4.14   Use Limitations ...............................................................................................38
4.15   International and Territorial Shipments ...........................................................38

4.16   Contractor ............................................................................................38
4.17   Ordering ...............................................................................................38
4.18   Reporting .............................................................................................38
4.19   Payment ...............................................................................................39

## Chapter 5.   Miscellaneous

5.1   Special Units .........................................................................................40
5.2   Records..................................................................................................40
5.3   Forms.....................................................................................................40
5.4   Tort Claims By Inmates For Mail Matters ..........................................40
5.5   Inmate Claims to the USPS...................................................................41
5.6   Inmate Claims to United Parcel Service ..............................................41

## Chapter 1.   General

### 1.1   INTRODUCTION

Mail is the primary means of communication between inmates and the community.   It is important that mail be well-managed and that services be provided professionally and efficiently.

Management of mail in a correctional environment is an especially demanding proposition. Staff must be familiar not only with the processing of personal and official mail, but also must be primarily aware of situations that can lead to breaches of security and order in the institution.

Mail room staff normally have daily contact with personnel of the U.S. Postal Service (USPS) and the local Postmaster, and personnel with contracted carriers such as United Parcel Service (UPS), Roadway Packaging System (RPS), Airborne Express, and Federal Express (FEDEX). Good relationships will be fostered so that mail issues can be resolved if they arise.

### 1.2   SUPERVISORY STAFF

The Case Management Coordinator (CMC) is accountable for all department functions, including the processing of inmate and official mail.   The Supervisory Correctional Systems Specialist (SCSS) will assist with monitoring mail room operations.

The SCSS will monitor mail procedures to ensure the timely processing, accountability and processing of funds, and proper handling of special mail.   Special care must be given to detect contraband and other prohibited acts.

### 1.3   MAIL ROOM SECURITY

The mail room will be secure from unauthorized entrance.   A window or half-door is recommended in order to conduct business while excluding access.   The mail room should generally be situated in a single room, without outside windows.   Where outside windows exist, they must be secured (with security screens) or bars to prevent easy access.

The entrance to the mail room will be secure at all times.   Unauthorized personnel may not have access to money, forms, or equipment used to process money.

Staff will open all incoming inmate mail, newspapers, magazines, books, and packages and inspect the material for contraband prior to distribution.

Only one inmate at a time is allowed to work in the mail room and will be under constant and direct supervision.

**Note:** If the mail room operates in a shared service capacity, the number of inmates that are allowed to work in the shared service mail room may be increased by one inmate for each facility that share mail room services.   Satellite Prison Camps are not considered a standalone facility. A one to one, staff to inmate, ratio will be maintained.

The inmate **will not have access to mail** (including newspapers and magazines), certified or special mail, packages, receipts, log books, or forms.   Inmates will not be permitted, **under any circumstances**, to process or deliver any inmate mail.   Inmate work will be limited to janitorial and loading/unloading services only.

Addresses will be protected when inmates are loading/unloading bags and boxes.   When inmates help load/unload packages, mail room staff will ensure the packages are sealed prior to the inmate's access to the package.   Inmates are not allowed access to the mail room while first class or package mail is being processed.

All mailing labels, envelopes, and other official preprinted Bureau mailing supplies will be secured and may not be made available or accessible to inmates.

## 1.4    SCHEDULE OF OPERATIONS

The Bureau ordinarily provides mail service (processing and delivering of mail), to inmates on a five-day schedule, Monday through Friday.   Institution emergencies may preclude mail service. However, mail service will resume upon the conclusion of the emergency.   Usually, weekend and holiday mail services are not provided.   Mail room staff will hold "open-house" for the general population at least twice a week.   The CMC, SCSS, or staff in an acting capacity, will make regular visits to administrative and special housing units.

To ensure inmates have the opportunity to address mail concerns, local procedures will be developed in institutions where the general inmate population does not have access to the mail room.

Each Warden will determine if local procedures are needed to handle holiday/weekend mail. For example, weekend mail service may be provided during the Christmas season and at other times when a holiday occurs during the Monday through Friday period.   These procedures will be addressed in the Institution Supplement.

## 1.5    PUBLICATIONS AND REQUESTS FOR GUIDANCE

Each CMC will ensure staff possess the skill to access and use the Sallyport Policy/Forms Intranet web site effectively, or ensure copies of the following are current and in the mail room:

■   **Mail Management Manual**.

- ■ **Correctional Systems Manual** and the Program Statements **Correspondence**, **Inmate Personal Property**, and **Incoming Publications** (with related Institution Supplements).
- ■ USPS International Mail Manual, if warranted by local need, and USPS Domestic Mail Manual (DMM).   Additionally, the DMM is available on the USPS website at www.USPS.com.

The mail room staff will notify the CMC when mail handling problems arise which are not clearly defined.   The CMC will then forward a written request for guidance to the local servicing postmaster.   Copies of the correspondence and replies will be retained in the mail room for review.

Mail room staff will obtain postage rate charts through the local servicing post office.   These charts must be current and placed in areas where inmates have access (e.g., commissary, mail room, units, law library, etc.).   If staff are unable to obtain updated postage rate charts, the CMC will be notified.   The CMC will then contact the local service postmaster to obtain the charts.

Reference documents, USPS guidance, and approved variances must be retained and filed for future review.   The CMC will ensure this file and these documents are maintained and current.

## 1.6    EQUIPMENT

The CMC is encouraged to consult with the local servicing post office to determine the type of equipment to be used in the mail room.

Institutions are required to use a postage meter or stamps to pay for official mail being processed through the USPS.   Equipment for use in metering official mail will consist of an electronic scale interfaced with a postage meter capable of being "reset" by telephone.   This equipment will be obtained under contract with a maintenance agreement.

When new meters are to be ordered, the Central Office Correctional Programs Branch must be contacted for guidance and to obtain the agency code used on the application for a meter license. The application for a meter license is obtained from the local servicing post office.

UNICOR locations that have significant mail volume warranting a meter separate from the institution, will request approval via memorandum from the Federal Prison Industries (FPI) Business Administrator.

If used, letter openers, box openers with razor blades, etc., will be carefully accounted for and kept secured when not in use.   Inmates will not have unsupervised access to this equipment under any circumstances.

Appropriate ink-pad type rubber stamps containing endorsements required in either the (DMM) or this Manual will be obtained and used.

Funds (monies and negotiable instruments) received through the mail will be retained in the mail room until processed for rejection, normally within 24 hours of receiving.   The Warden will identify the secure receptacle in the mail room to store unprocessed funds. Funds placed in the secure receptacle will be processed the next business day.

## 1.7    TYPES OF MAIL

a.   **Official Mail.**   Official mail is mail whose cost is borne by the U.S. Government and relates exclusively to the business.   Official mail services relate to staff official mail and to inmate packages officially forwarded as a result of institution administration.

b. **Inmate Correspondence.**   "General correspondence" is incoming or outgoing correspondence other than special mail, including magazines and newspapers.   Whether sealed, unsealed, stamped, or un-stamped, inmate correspondence is forwarded according to the procedures in this Manual and the Program Statement **Correspondence**.

c. **Packages.**   A package is a bundle, usually of small or medium size, that is packed, padded, wrapped, or boxed.   Additionally, an article weighing 16 ounces or more containing other than paper material or excessive paper material is to be considered a package and will require approval in accordance with this Manual.   While packages are encompassed within the broad term, "general correspondence," they receive distinct processing and ordinarily require approval prior to receipt.

All inmate personal property packages will be authorized via the Authorization to Receive Package form (BP-A0331). The package will:

- ■   Have prior approval.
- ■   Be verified by the initiating department.
- ■   Be signed by the department head concerned.

Each package received from another institution will contain an Inmate Personal Property Record (BP-A0383), or Authorization to Mail Package (BP-329).   When a package is received from another institution with a BP-329 form, the box must also bear a Bureau security stamp in accordance with the Program Statement **Receiving and Discharge Manual**.

Packages received, which fall under the authorization of the Program Statement **Incoming Publications,** will be opened for inspection, but do not require prior approval.   Regular publication mailings for example, a monthly "Book of the Month Club," do not require prior approval each month (see Chapter 3 for further details).

## 1.8    STAFF PERSONAL MAIL

Staff may not receive personal mail at the institution through the institution mail room (this does not apply to mail USPS delivers to staff quarters).   Staff may not use the institution mail room for processing or forwarding personal mail.   Staff personal mail will not be processed from institutions.

## 1.9    OCCUPANT OR CURRENT ADDRESSEE MAIL

Mail addressed to "Occupant" or "Current Addressee" will be considered delivered when received at the institution; it becomes the Warden's property; and will be disposed of as the Warden stipulates.   (**Note:**   Mail addressed to "a personal name or occupant," for example: "Tom Williams or current occupant," is considered addressed to the person named and processed as mail to that person.   If the named person is not at the institution, the mail will be considered as belonging to the "current occupant" and will be disposed of as the Warden stipulates).

## 1.10    AUTHORITY FOR DISPOSAL OF MAIL

Authority to dispose of or destroy mail addressed to a specific person rests **solely** with the USPS. Bureau staff **do not have this authority** and will return undelivered mail to the local USPS.

## 1.11    PRIVATE CARRIERS

Private carriers, such as UPS, Airborne Express, FedEx, etc., may ship and carry weapons and ammunition or other potentially dangerous materials.   Therefore, they will not be permitted inside an institution's secure perimeter without going through the proper security checks. Material these carriers deliver will be received outside the institution and thoroughly inspected prior to delivery into the institution.   This provision covers package delivery and is not to be construed to prevent access to the institution by shipping companies requiring access with full loads.   When there is doubt, the Captain will be contacted immediately.

Private carriers must not be confused with the USPS.   When using private carriers for forwarding, post office boxes will not be used as any portion of the address.   Private carriers do not have access to, nor can they use, USPS post office boxes.   When addressing correspondence or packages to be sent via a private carrier, be sure to use a street and number, route or road designation, in addition to the city, state, and ZIP code.

## 1.12    MANDATORY OPENING AND INSPECTING OF MAIL AND PACKAGES

Staff are **required to open and inspect** all inmate mail and packages prior to distribution (including mail being returned to an inmate).   Local procedures, contained in the Institution Supplement, must be developed to ensure inspection procedures are performed.

Inspection and searches of inmate mail and packages will be consistent with applicable search policies.

To increase security and preclude attempts to introduce contraband, packaging material (whether for inmate or staff) will be removed, treated as "hot trash," and properly disposed of as required by local policy.   It may not be used to forward packages within the institution.

Staff will open special mail (see the Program Statement **Correspondence**) in the inmate's presence.

Packages addressed to inmates will be opened and inspected before inmates are given access to the package or its contents.   Once a package is opened, it comes under the authority of the institution.   If a package is to be forwarded or returned, it will be resealed and mailed at government expense.

To preclude having to open a package and then forward it because it was not authorized, mail room staff will take approved BP-A0331 forms to the local servicing post office.   A package for which there is no approved BP-A0331 can be **refused** immediately as unauthorized and returned to the sender.   A notation to this effect will be made on the package at that time.   (See Chapter 3, section 3.14, for further details.)

Packages addressed to staff will be x-rayed prior to being brought into the secure perimeter of the institution.   While packages for staff do not require pre-approval, staff receiving packages containing items for inmates will be returned.   (See Chapter 3 for further details.)

**Note:**   At administrative institutions, mail for minimum security level inmates may be treated as minimum security level mail if the Warden determines that this mail may be processed as such.

Controlled narcotics, x-ray film, and other sensitive and controlled substances may be delivered in packages addressed to the Health Services Department.   Therefore, extra caution must be exercised when inspecting them because using a fluoroscope machine or exposing x-ray film to light may ruin them.   Packages are to be held in a secure area such as the rear gate, etc., depending on the institution security level.

**Chapter 2.   Official Mail**

## 2.1   PAYMENT FOR MAILINGS

Official mail will not be forwarded via the Official Mailing Indicia.   All official mail forwarded through the USPS by the Bureau will be forwarded using some method of pre-payment (metering or postage stamps).

## 2.2   USE OF POSTAGE METERS

The postage meter will be placed in an area with a telephone line in the immediate vicinity and in an area not accessible to inmates.   The postage meter will be reset by telephone (funds placed on the meter).   The amount allowed for reset will depend upon the type of facility where the meter is located.   Meters will be reset with enough funds to allow approximately one month of mail to be processed.   The reset statement subsequently sent from the contractor will be maintained in the mail room.

## 2.3   PROHIBITED METERING

Metering of envelopes for use at a later date or for use as a "reply envelope" is prohibited.   Once a piece of mail has been metered, the metering mark serves as the postmark.

## 2.4   UNICOR POSTAGE

Where UNICOR uses the institution's postage meter to mail its official mail, the following procedures will be followed:

- A separate account code will be established on the meter for UNICOR.
- The UNICOR account will be read from the meter on the 25th of each month, and reported via memorandum to the institution Business Administrator.   UNICOR will be billed for usage through the institution billing process.
- If the 25th falls on a weekend or holiday, the meter will be read on the previous workday.

## 2.5   PAYMENT OF POSTAGE BY GOVERNMENT

If a question arises concerning payment of postage at the government's expense, a request for clarification will be made to the Regional Correctional Programs Administrator.

## 2.6   BUSINESS REPLY MAIL

Staff will provide a Business Reply Mail (BRM) envelope to respondents when a reply to official business is necessary.   Business reply license number 14045 has been issued to the Bureau of Prisons (which includes Community Corrections Offices) and license number 99035 for

UNICOR.   Inmates may not have access to official business reply envelopes unless received from another Bureau institution or office soliciting an immediate response.   Outgoing mail placed in a BRM will be treated as general correspondence and left opened by the inmate.

The USPS requires that agencies determine the method of payment for BRM.   The Central Office has elected to fund a "site" fee for each institution and Regional Office.   Site fees for Community Corrections Offices will be established on an as-needed basis.

The site fee permits the USPS to process all BRM to a given site, regardless of the quantity of BRM processed.   The CMC, Correctional Programs Administrator, or Community Corrections Manager (CCM) at newly established institutions, Regional Offices, or Community Corrections Management Offices (or any other newly established Bureau mailing site) must go to their local servicing USPS facility and apply for a site BRM permit.   The application must show the appropriate license number, #14045 for the Bureau including Community Corrections offices and #99035 for UNICOR.

The application will indicate that the initial and annual billing for the site fee is charged to the Central Office.

## 2.7    OBTAINING OFFICIAL MAIL SUPPLIES

Envelopes, labels, and other items for use with official Bureau mail will only be obtained from UNICOR.   Requests for stock will be forwarded to:

UNICOR, Customer Service Center
PO Box 11670
Lexington KY 40577-1670,

or orders may be sent by fax to (606) 254-9048.

When ordering this material from UNICOR, the official return address for the institution will be provided either by sample or photocopy accompanying the order.   The Business Office will be responsible for funding, issue, and control of stock on behalf of all offices.   The Business Office will consult with the CMC when ordering to assure that orders are correct in design, return address, etc.

A Bureau site **may not** obtain pre-printed envelopes which include a department, office, section, or other identification in the return address.   Official envelopes will contain only the site's general return address.   Department or office identification will be stamped, typewritten, or handwritten immediately below the site return address.

## 2.8    OFFICIAL MAIL STATIONS

Official mail will be dispatched only from official Bureau mail rooms.   Official mail **may not** be placed in street boxes or delivered by unauthorized staff directly to Post Offices.   Authorized mail room staff must process all official mail through the official mail room to the USPS.

## 2.9    FORWARDING OFFICIAL MAIL

Official mail, received at Bureau locations, which has been opened will only be forwarded by re-covering the mail in another envelope and preparing the piece for re-sending as a new mailing. Official mail received which has not been opened does not need re-covering, but will be returned to the Post Office with endorsement for forwarding or other appropriate disposal.

To economize, "batch" mail should be used for forwarding all official mail whenever possible.

## 2.10    INMATE PACKAGES AS OFFICIAL MAIL

Except when otherwise specified in policy (for example, Program Statements **Inmate Recreation Programs** and **Inmate Personal Property**), inmate packages will be considered "official mail" when required to be mailed from the Bureau or required by the government to be mailed as a result of its administration.

## 2.11    OFFICIAL MAIL PROCESSING

a. **Incoming Mail**.   Staff pickup of departmental mail at the mail room is expected, provided the layout of the mail room allows security and staff access to mail.   Official mail will be separated from inmate mail and handled separately.   Envelope mail will be sorted by department for pickup.

b. **Negotiable.**   Negotiable instruments received through the mail room will be processed for rejection, within 24 hours of receipt.   The sender is required to mail funds intended for an inmate commissary account directly to the National Lockbox.   Negotiable instruments scheduled for rejection may be retained in the mail room.

c. **Official Mail Packages.**   A log will be maintained for all incoming registered, certified, or insured letters and packages addressed to staff.   A separate log may be used for each type of mail and appropriate receipts are to be obtained.

d. **Outgoing Mail.**   To every extent practicable, staff will address outgoing official mail to an office or official title, as well as, to an individual by name.

All outgoing official mail will be sealed in the office of origin.   The initials and office of the sender will be entered in the upper left corner of each piece.   Other locations, such as

Community Corrections Offices, Regional Offices, and staff offices in the Central Office may wish to place the mailer's name and office identification in the same manner to assist in controlling mail forwarded to or returned from institutions.

Staff will deposit outgoing official mail in depositories located in the Warden's office and/or mail room.   Durable envelopes will be used for mailing inmate files.   Envelopes especially provided for handling files in the movement of inmates via bus/airlift are not to be used for mailing purposes.

Institution metered mail strips are only to be used for official mail.   Inmates will not be provided or sold metered mail strips.

## Chapter 3.   Inmate Mail

### 3.1   GENERAL

All mail room staff will be thoroughly familiar with the provisions of the Program Statements **Correspondence**, which contains criteria for sending and receiving inmate correspondence; **Inmate Personal Property**, which provides guidance as to what constitutes inmate contraband and the processing of this material; and **Incoming Publications**, which provides guidance related to the processing of incoming newspapers, magazines, books, etc.

An institution's size and complexity, the degree of the inmate's sophistication, and many other variables require flexibility in correspondence procedures.   The Warden will establish controls to protect inmates and maintain the institution's security, discipline, and good order.   For example, if an inmate attempts to solicit funds or items (e.g., samples) or subscribes to a publication without paying for the subscription, staff may consider limiting the inmate's correspondence as specified in the Program Statement **Correspondence**.

It is important that mail room staff communicate with other staff, particularly unit staff and correctional services, so that potential inmate management problems can be identified and resolved.   Also, CMCs and mail room staff must ensure that all inmates have access to mail services.

If a piece of incoming controlled mail (registered, certified, etc.) is lost or misplaced, the sender (not the inmate) must initiate the traces and follow-up action with the USPS or private carrier. The sender is in the best position to initiate tracing activities because it was the sender who paid the fees, completed the forms, and knew the mailing circumstances.

In the case of outgoing controlled mail, staff will assist the inmate to file tracer documents with the servicing post office.

### 3.2   ACKNOWLEDGMENT OF INMATE (BP-A0407)

Upon admission to the institution, inmates complete an Acknowledgment of Inmate (BP-A0407) form.   Staff will forward a copy of the BP-A0407 form to the mail room for inmates who elect (by executing Part 1-I of the BP-A0407) not to receive their general correspondence.   A current listing of inmates who have elected **not** to receive their general correspondence will remain on file in the mail room.   General correspondence for these inmates will be returned to the sender, unopened, with the endorsement "refused."

An inmate who refuses to sign the BP-A0407 will receive general correspondence under the same conditions as if Part 1-II had been completed and signed.   That is, staff will complete the bottom portion of Part 1-II and inmates will receive their general correspondence after it is opened and all inspections are completed.

All special mail will continue to be processed to the inmate as provided in the Program Statement **Correspondence**.

**Note:** The Bureau has the authority to open, read, and inspect general correspondence prior to inmate access.   The procedures prescribed here specifically allow an inmate to elect **not** to have mail opened and read.   If this option is elected, mail (other than special mail) will be returned. If the inmate elects to receive general correspondence and signs the appropriate portion of the form, correspondence is inspected and delivered.   If the inmate does not make a choice, by refusing to sign the form, the inmate will receive general correspondence after staff open and inspect it.

## 3.3    INMATE MAIL SERVICES

The Warden will establish one or more depositories, which will be centrally located, to ensure accessibility to the inmate population.   Staff will pick up and deliver the contents to the mail room in accordance with the schedule of operations (Refer to section 1.4).   Inmates will be provided mail service for correspondence as outlined in the Program Statement **Correspondence**.

Stamp collecting and USPS box services are not available for inmates.   Outgoing express mail, UPS (and other private carriers) are not provided.   Express mail, UPS, telegram, etc., when received as material coming into the institution, will be routinely processed.   When received on weekends, these items are usually signed for by non-mail room staff and secured until normal mail room hours resume.

Staff will develop and implement local procedures for delivering and collecting mail for inmates who do not have ready access to these services (e.g., segregation, hospital).   Such procedures will ensure the receipt and delivery of correspondence and mail are comparable with the rest of the inmate population.

It is important that these procedures must ensure the receipt and delivery of special mail.   For example, local procedures must ensure receipt and marking of special outgoing mail in a manner that will accomplish this as if the inmate had ready access to normal procedures.

## 3.4    PROCESSING INCOMING INMATE MAIL

After receipt, separate "Special Mail" from general inmate mail.  **Do not open inmate mail at this time**.

Determine those inmates currently at the institution, using a SENTRY roster.   Bureau authorized computer programs (MailFast) may also be used.   This list/program must be kept current by:

- ■ Adding the names of all new admissions.
- ■ Deleting the names of those inmates who have been released.
- ■ Noting all correspondence restrictions in effect.

Remove mail for inmates no longer at the institution and forward appropriately, normally within 24 hours.

It is important that each piece of mail be matched against various directories prior to opening to assure that **only mail for inmates presently at the institution is opened**.   Mail for inmates not presently at the institution will be returned, unopened, to the local servicing post office with endorsement for forwarding or other appropriate disposal.    This does not include inmates temporarily released for the day.

Care must be taken when opening correspondence to avoid cutting or damaging the contents.

**Random Reading.**   Consistent with the provisions of Bureau regulations codified at 28 CFR 540.14, as contained in the Program Statement **Correspondence**, all incoming general correspondence, and all outgoing mail (except "special mail") is subject to random reading by staff.   The objectives to be accomplished in reading incoming or outgoing mail differ from the objectives of inspection.

In the case of **inspection** (to which all incoming general correspondence is subjected), the primary objective is to detect contraband.   The random **reading** of mail is intended to reveal plans to commit criminal acts or to monitor a particular problem confronting an inmate.

While reading correspondence, a staff member may incidentally learn of information concerning the private lives of inmates or their correspondents.   Bureau staff must be sensitive to the fact that most information in correspondence is of a private nature and must be handled discreetly. Unless there is a legitimate correctional concern relating to the institution's security, safety, or orderly running, the contents of reviewed correspondence are not to be revealed to any other person.

Inmate correspondence that is opened and rejected or that is to be returned or forwarded for other reasons will be re-covered, sealed, and forwarded at government expense.

## 3.5    MAIL RETURNED TO INMATE

Mail being returned to an inmate will be processed as general or special correspondence, as appropriate.   Returned mail will not be provided to inmates until appropriate examinations are completed.   Returned special mail will be logged and processed as special mail (open in inmate's presence, check for contraband only, etc.).

## 3.6    EXAMINATION

Examine each letter carefully for contraband, unauthorized material, negotiable instruments, money, etc.   An item received that cannot be searched or examined without destruction or alteration (e.g., electronic greeting cards, padded cards, double-faced photograph) will be returned to sender**.**

The material to be returned, along with the correspondent's copy of the Stamps, Negotiable Instruments & Other Returned to Sender (BP-A0328) form, must be re-covered and sent to the correspondent.   An appropriately completed BP-A0328 will also be provided to the inmate.

Return addresses will be closely reviewed.   Correspondence between confined inmates must be approved in accordance with the Program Statement **Correspondence**.   Correspondence not properly approved will be rejected, using a Returned Correspondence form (BP-A0327).

## 3.7    DELIVERY

After all inspections are completed, re-close each letter (staple, tape, etc.), finish sorting, and prepare for delivery as directed by local procedures.   Caution will be taken when re-closing letters with a stapler to ensure contents are not stapled.   Incoming correspondence will be delivered daily Monday through Friday.   Delivery of letters may not be delayed and ordinarily will be made within 24 hours of receipt, excluding weekends and holidays.

## 3.8    SPECIAL MAIL

The Bureau policy on inmate correspondence identifies certain types of incoming correspondence as "special mail," **to be opened only in the inmate's presence.**   For this special handling to occur, Bureau policy requires that the sender be adequately identified on the envelope and that the envelope be marked "Special Mail — Open Only in the Presence of the Inmate" or with similar language.   Refer to the Program Statement **Correspondence** for those offices which are not required to use the "Special Mail" statement.

Staff will use professional judgement to determine whether correspondence is from either the Chambers of a Judge or a Member of the U.S. House of Representatives, Senate, or Executive Office.   **This type of mail will be afforded special mail handling even without the special mail marking.**   Other Congressional and judicial correspondence will be afforded special mail handling provided the sender is adequately identified on the envelope and the envelope has the special mail marking in accordance with the Program Statement **Correspondence**.

The Bureau has prepared an instruction sheet, Special Mail Notice (BP-A0493), for an inmate to include with correspondence the inmate sends to the attorney representing that inmate.   This instruction sheet advises the attorney of the required procedures for incoming attorney-client correspondence to be afforded special mail privileges.

CMCs will ensure that copies of the instruction sheet for special mail handling of incoming attorney-client correspondence are provided as admission and orientation handouts and are placed in inmate housing areas, attorney visiting rooms, and other locations accessible to inmates.

Specifically, the attorney must be adequately identified on the envelope as an attorney and the envelope must be marked "Special Mail — Open Only in the Presence of the Inmate," or with similar language clearly indicating the particular item of correspondence qualifies as special mail and the attorney is requesting the correspondence be opened only in the inmate's presence.

The use of the title "Esquire" without additional indication of the sender's occupation does not establish the bearer as an attorney or legal aid supervisor.   Mail from individuals using the title "Esquire" as the exclusive identification of their status shall not be handled as special mail, even if the envelope contains some special mail markings.   However, use of the title "Esquire" after the sender's name, in addition to the same name being included in the return address of the law office, does sufficiently identify the sender as an attorney.   Alternatively, the use of the term "Esquire" after the sender's name, in addition to some notation on the envelope that the sender is an attorney (i.e., Attorney-At-Law) is also sufficient identification.

**Other Mail.**   The Warden may treat incoming mail that does not meet all of the requirements for special mail handling in the same fashion as special mail, including opening it in the inmate's presence and inspecting it only for contraband.   It is recommended the Institution Supplement outline local criteria used to identify incoming special mail.

## 3.9    IN/OUT PROCESSING REQUIREMENTS FOR SPECIAL AND LEGAL MAIL

Ordinarily, inmate correspondence will be processed and delivered with 24 hours.   Special and legal mail is afforded priority.   Reasonable efforts by staff to deliver legal/special mail will be documented in the log book if the mail is unable to be delivered as provided by this policy. Staff must further document the attempts to deliver legal/special mail every 24 hours after the time initially logged until delivered.

Staff will open incoming inmate special mail in the inmate's presence.   Staff are to check for contraband and funds at this time.   Funds enclosed in the inmate correspondence are to be rejected.   Additionally, inmates are not permitted to receive or maintain in their property Pre-Sentence Investigation Reports or Statement of Reason.

Mail room staff will maintain a log detailing receipt and delivery of special mail.   Additionally, special/legal mail will be time-stamped, or a handwritten note will be made on the envelope, to show date and time received in the mail room.   Although inmates may be asked to sign for this mail, they are not required to do so.

Inmates will deliver their own outgoing special or legal mail directly to a staff member, normally a member of the unit team or correctional systems staff.   Staff receiving the mail will immediately confirm the inmate delivering it is the same inmate reflected in the return address. After this confirmation, the mail will be hand carried to the mail room.   If mail is received by staff beyond the established hours of the mail room, local procedures will be established in the institution supplement.   Special and legal mail will be received and processed in accordance with section 1.4 of this Manual.   Outgoing special or legal mail submitted without an accurate return address will not be processed and will be returned immediately to the inmate for correct preparation (institutions with TRULINCS will also include a TRULINCS generated mailing label).

Outgoing special mail weighing 16 ounces or greater will be processed as a package.   This requires using Form BP-329, Request Authorization to Mail Inmate Package.   Inmates may still seal their outgoing special mail before submitting directly to staff for further processing and it will not be opened unless contraband is apparent as a result of electronic scanning.

All outgoing special mail is subject to scanning by electronic means including, but not limited to x-ray, metal detector, and ion spectrometry devices.   Inspection of sealed outgoing special mail by these methods may occur outside the inmate's presence.   Electronic scanning is for the sole purpose of identifying harmful materials, and cannot be used to read or review the content of outgoing special mail communication.

Correspondence that meets the conditions of outgoing special mail that USPS subsequently returns, will be processed as incoming special mail (open only in presence, etc.). Returned special mail will be entered into all log books in the same fashion as other incoming special mail.

Periodically, CMCs will review the special/legal mail delivery process to ensure that policy requirements are met. CMCs will consult specifically with staff and review requisite record keeping to ensure that delivery time frames are being met.

When an inmate is not at the institution, the special mail remains sealed and is forwarded to the inmate regardless of the 30-day forwarding period for general mail.   Staff will use all means practicable to locate inmates to forward special mail (e.g., SENTRY, card files, telephone calls). If the inmate:

■   Has been transferred, the mail will be forwarded to the inmate at the final transfer destination.
■   Is out on writ, staff will use all means practicable to forward special mail.

■   Has been released to the community, Special and Legal mail will be forwarded to the address the inmate provided.   If a forwarding address is not available, forward the mail to the U.S. Probation Office in the release district, provided the inmate is, or was, under supervision.

■ Was released by expiration of sentence and a forwarding address is not available, return the correspondence to the sender with a notation of the date and type of release and a statement that no forwarding address is available.

When forwarding special mail, mail room staff will note forwarding details in the log.

## 3.10    INCOMING DEPOSITORY AT FDC/MCC/MDCS

FDC/MCC/MDCs will provide a depository for attorney/client correspondence in an area readily accessible to attorneys.   Other facilities, which house pretrial inmates, may also provide this service.   This depository will provide the means for an attorney to "hand deliver" legal material to a client for delivery.

A notice will be placed on the depository, "A return address will be provided for each item deposited in this box."   A return address is needed when the inmate has left the institution and cannot be located.   Since postage presumably will not have been placed on this material, the material requiring return will be covered for mailing at government expense.

The procedure established for handling of incoming "Special Mail" will be followed for processing this correspondence (must contain the special mail markings).   Correspondence placed in this depository not qualifying as "Special Mail" will be treated as incoming "General Correspondence."

## 3.11    INCOMING PUBLICATIONS

All incoming newspapers, magazines, and books will be handled in accordance with the Program Statement **Incoming Publications**.   For inmates not at the institution, this type of material, provided it was received through the mail, will be endorsed with a forwarding address (or other appropriate endorsement) and returned to the USPS for forwarding or disposal, as appropriate. **Under no circumstances** will this material be retained at the institution for general use, for example, in the library or another department.

## 3.12    NEGOTIABLE INSTRUMENTS

Negotiable instruments received through the mail enclosed in inmate correspondence will be rejected, ordinarily within 24 hours of receipt.   Funds received from a self-surrender, inmates returning from furlough, the U.S. Marshals Service and other law enforcement agencies for escorted inmates, may be processed locally.   A receipt will be prepared for all monies received in this manner.

Negotiable instruments along with the receipt will be placed in an envelope.   The envelope must be sealed, signed across the seal, taped shut, and a notation identifying the contents will be

placed on the front of the envelope.   **Note:** The envelope will then be secured in a night depository pending processing by the cashier.

The cashier will collect all money and receipts daily, except Saturday, Sunday, and holidays.   If, for some reason they are not picked up on the day they are received, all money and receipts will remain in the night depository

When funds are collected from the night depository the next business day, Business Office (Financial Management) staff are not responsible for counting un-receipted funds.   **No other funds will be placed in the night depository.**

**Note:**   Insurance, Trust, and all other similar settlement checks are generally considered as acceptance of settlement when processed or cashed.   Accordingly, whenever such negotiable instruments are received, they will be held in the mail room and the Unit/Case Manager notified. These checks will **not be** processed routinely or posted to the inmate's account.   If thereafter, the inmate desires to accept settlement, the check must be endorsed by the inmate (instead of the Deposit Fund [Accounting] Technician/Cashier) and then be processed in the usual manner. Further information can be found in the Program Statement **Trust Fund/Deposit Fund Manual**.

**All U.S. Treasury Checks will be forwarded to the local Business Administrator/Trust Fund Supervisor for processing.**

"Unsolicited Funds" such as funds received in a mail survey, contest, book or record clubs, etc., will be considered unsolicited and must be rejected.

### 3.13    INMATE PACKAGE MAIL – INCOMING

All incoming inmate property packages must be authorized in advance **unless otherwise approved under another Bureau policy**.   An Authorization to Receive Package or Property (BP-A0331) will be used for this purpose.   A BP-A0331 is valid for no more than 60 calendar days from the date of approval.

**Note:**   Some packages are authorized under other Bureau policies (for example, educational or legal materials).   Inmates must be enrolled in an education program approved by the Supervisor of Education (SOE) or other authorized staff in order to receive educational materials.   Local procedures must be established to notify the mail room of inmates who are enrolled in approved education programs.   Inmates should be advised that they are not required to have these packages pre-approved.

These packages must be marked with words such as "Authorized by Bureau Policy."   Some publications are mailed to the institution as a package.   If this type of package is identifiable as coming from a commercial source such as a publisher, bookstore, or a book club, it will not require a BP-A0331, or the marking "Authorized by Bureau Policy."   They are intended to alert

mail room staff that enclosed materials contain matter which does not require prior approval. These markings assist mail room staff to identify and process the materials and avoid erroneous returns.   The Case Management Coordinator will assure this subject is covered during A&O.

Use of a BP-A0331 or Inmate Personal Property Record (BP-A0383) form is not needed for items approved under other Bureau policies.   A package received without an appropriately completed BP-A0331, or without markings indicating authorized materials enclosed, **is considered unauthorized and will be returned to the sender.**   A package containing an expired BP-A0331 will also be returned to the sender.   If necessary, a return address will be obtained from the inmate.

If, upon inspection, a package marked with the special mail markings, or marked as material otherwise approved under Bureau policy, contains property or other than approved material, the **entire** contents will be resealed and returned at government expense.   An appropriately completed BP-A0328 will be executed and distributed.

If a package contains materials approved under Bureau policy, the material must still be inspected to assure it meets the specific requirements of policy.   For example, the package may be marked as educational materials and contain only educational materials, but each item must be reviewed to assure it meets the criteria of the Program Statement **Incoming Publications**.   If one or more items were questionable, the procedures of the Program Statement **Incoming Publications** will be followed while the remaining items will be accepted.

To facilitate package processing, the BP-A0331 will be taken to the local servicing post office. If there is a package for an inmate with no corresponding BP-A0331, and the package does not contain markings as stated above, the package will be annotated "Refused Return to Sender – Authorization for Receipt Not Obtained."   If a package is at the post office addressed to an inmate in care of a staff member, there is no BP-A0331 on file, and/or the package is not marked as stated above, the package will be refused and returned.

Local procedures will be developed to receive and process appropriately marked legal materials or special mail received as a package.   This material will be opened in the inmate's presence.

Incoming inmate package mail will be refused and returned to the sender if it is received without an appropriately completed BP-A0331, and where no markings indicate authorized materials are enclosed or if it is not identifiable as coming from a commercial source.   When refusing and returning incoming inmate package mail, staff will:

- Fill out a BP-A0328 indicating the reason the incoming inmate package mail was refused and returned (staff may complete the BP-A0328 form while at the post office or may record the information and complete the form upon return to the institution).
- Send the record copy of the BP-A0328 to the sender.
- Return the inmate package mail to the sender.

- Deliver a copy of the BP-A0328 to the inmate.
- Forward a copy to the inmate central file.

All packages received from the post office will be x-rayed prior to being brought into the secure perimeter of the institution.   In the event the x-ray machine is unavailable, management will determine an alternative method to inspect the package (e.g., open and inspect).

Once brought into the secure perimeter of the institution, special or legal mail packages will be separated from other received packages.   This material will be opened in the inmate's presence. All packages received by mail room staff are under the control of the institution and will be opened and inspected in accordance with section 1.13 of this Manual.

If there is an authorization to receive personal property on file, the inmate may receive the package, which may be reopened and inspected in the inmate's presence.   Local procedures will delegate the responsibility for issuance.   All authorized packages which enter the institution must be inventoried on a BP-A0383 or BP-A0331 in the inmate's presence within 48 hours, excluding weekends and holidays.   This provision excludes packages containing release clothing (these packages will be stored in R&D until the inmate is released).

If the package is cleared for issuance, the inmate will acknowledge receipt on the original Package Authorization BP-A0331, or the Inmate Personal Property Record (BP-A0383), as appropriate.

If the package is to be issued from another department, that department will be called to arrange pickup of the package.   The employee to whom the package is issued will acknowledge receipt on the package authorization form's original copy, which will then be forwarded to and filed in the Inmate Central File.   The inmate will sign the package authorization form shipping copy when he/she receives it.   The issuing department will retain this copy for its own record.

Package authorization form originals (or the appropriate BP-A0383 copy), fully executed to signify delivery, will be filed in the Inmate Central File.

## 3.14    UNAUTHORIZED MATERIAL AND CONTRABAND

Mail room staff must be thoroughly familiar with and have readily available, the Program Statement **Inmate Personal Property**.   Mail room staff must be familiar with the definition(s) and processing requirements related to contraband as outlined in this directive.

**Contraband** is any unauthorized material in an inmate's possession.   Any physical things sent to an inmate that constitute contraband are considered unauthorized material.   Mail room staff will ensure that inmates do not receive contraband.   Serious contraband (such as illegal drugs, firearms, weapons, etc.), will not be returned to the sender but must be retained **with** any correspondence and referred to the Special Investigative Supervisor (SIS) as evidence for

investigation and appropriate disposition.   Pre-sentence Investigation Reports and Statement of Reason received through the mail will be considered contraband and will be rejected.

A correspondence rejection form **will not be** prepared; however mail room staff will prepare a memorandum detailing the circumstances and general description of the physical item(s).   This memorandum, along with the correspondence, will be given to the CMC for signature.

The item(s) will be given to the SIS, who will document receipt of the items on the memorandum.   The memorandum will be placed in the Inmate Central File's FOIA exempt section.   Minor or nuisance physical things (such as hair, plant shavings, small artifacts and items, and sexually explicit personal photographs, etc.) are not authorized and will be returned to the sender.   A Stamp, Negotiable Instrument or Other Items Returned to Sender form (BP-A0328) will be completed.   The correspondence and a copy of the BP-A0328 will be provided to the inmate.   The material to be returned and a copy of the BP-A0328 will be covered and returned to the sender.   A copy of the BP-A0328 will be filed in the Inmate Central File. The Program Statement **Correspondence** provides circumstances for rejecting correspondence.

Ordinarily, mail will not be delayed because of investigatory processes.   During an investigation of incoming mail, the investigating office will perform reviews in a manner that will not delay delivery.   The CMC will establish a procedure that mutually meets the needs of the investigators and the requirement to generally deliver mail within 24 hours and packages within 48 hours.

An inmate may not receive through the mail, stamps or stamped items, such as envelopes embossed with stamps or postal cards with postage affixed.   If such items are received, they will be returned, at Government expense, with a BP-A0328 form explaining that such items may not be sent to an inmate.   A copy of the form will be placed with the inmate correspondence for delivery to the inmate.

If private sector business reply envelopes or cards are contained in otherwise authorized mail, there is no prohibition from leaving it with the authorized mail.   If an inmate uses business reply mailers to order

subscriptions or other materials with no intention of paying for material ordered, mail room staff are to confer with the appropriate Unit Manager and refer to the procedures specified in the Program Statement **Correspondence**.

An inmate may receive mail from Bureau institutions and offices and from other Government agencies (Veterans Administration, Selective Service, Social Security, Bureau, etc.).   This mail may include an enclosed Business Reply Mail (BRM) indicia for the inmate's use in replying to that agency without charge.   This would also apply to indicia provided for absentee balloting (eligibility to vote is determined by each voting locality).

## 3.15    REJECTED CORRESPONDENCE

When correspondence is to be rejected, mail room staff will refer to the potential reasons for rejection and related procedures contained in the Program Statement **Correspondence**.   A Returned Correspondence form (BP-A0327) will be completed.   The correspondence will be copied and the entire packet presented to the Associate Warden.   See the Program Statement **Correspondence** for further details.

## 3.16    OUTGOING INMATE LETTER MAIL

Staff assigned to work in the mail room must be thoroughly familiar with the Program Statement **Correspondence**.   Of special concern are the instructions related to:

- ■   Sealing outgoing letters.
- ■   Restricted correspondence.
- ■   Special mail.
- ■   Correspondence between confined inmates.
- ■   Payment of postage.

Ordinarily, all outgoing letter mail will be processed within 24 hours, excluding weekends and holidays.   In any event, inmate correspondence and mail are under the purview of institution authorities.   Staff will assure when special mail is received from the inmate, it is sealed, stamped or labeled on reverse, dated, and the institution return address noted.   This mail will be dispatched within 24 hours as provided in the Program Statement **Correspondence**.

Special mail will not be processed on weekends.   Therefore, any special mail received over the weekend will be processed on Monday and will be marked as having been received on the immediate preceding Saturday.   If a holiday is in conjunction with a weekend, the special mail will be marked as having been received on the day after the last workday preceding the holiday weekend.

All outgoing inmate mail will be handled in accordance with the Program Statement **Correspondence**.   Inmates are informed during A&O that the Bureau retains the right to open an inmate's outgoing mail (except special mail) under the conditions specified in the Program Statement **Correspondence**.

Inmate correspondence may be mailed using envelopes the institution supplies or purchased from the Commissary.   Institution-supplied envelopes will be standard business size, ordered only from UNICOR, and contain the institution's **printed** return address (specified at the time of ordering) in accordance with the Program Statement **Correspondence**.

All outgoing mail, for institutions with a TRULINCS generated mailing label system, must utilize these mailing labels on all outgoing correspondence, in accordance with the Program

Statement **Trust Fund Limited Inmate Computer System (TRULINCS) – Electronic Messaging**.  In addition, inmates will place correct identification (full committed name, register number, and complete institution return address) on the envelope.   Failure to include any of the above information will require the material to be returned to the inmate for correct preparation.  See the Program Statement **Correspondence**.   If the sender cannot be identified the letter will:

- Be annotated as to circumstances, to include the date received on the envelope.
- Filed for a period of two years.
- Then destroyed.

The Bureau has received a request from the Internal Revenue Service (IRS) that inmates in Bureau institutions send any IRS correspondence directly to the attention of the Chief, Criminal Investigation Branch, at the service center to which the letter is addressed.   Staff may place the notation directly on the envelope the inmate prepared.   Staff are only adding the attention line to assure the envelope is directed to the Criminal Investigation Branch of the IRS Center.

Special attention will be given to all inmate correspondence addressed to state tax centers and will include the following notation below the inmate's return address:

**"This correspondence is from an inmate in custody of the Bureau of Prisons."**

Locally produced SENTRY labels are suggested for this purpose.

Stamps will not be used as negotiable instruments or legal tender to pay for materials ordered from private vendors.   If stamps are enclosed as payment, the stamps, envelope, and contents will be returned to the inmate.   The inmate will be directed to use the authorized method of payment through Trust Fund withdrawals.

## 3.17    INMATE PACKAGES  –  OUTGOING

a. **Outgoing Personal Packages.**   Packages mailed as a matter not resulting from institution administration are personal and will be forwarded at the inmate's expense.   Ordinarily, these packages will be forwarded within 48 hours.   Such packages will be forwarded using stamps the inmate supplied.   The inmate may obtain additional services (insurance, return receipt, etc.).  The inmate will provide stamps for basic postage and the cost of each additional service.   The stamps will be placed on the package at the time of mailing.   A BP-329 is to be completed noting all details related to the mailing.

The USPS Firm Mailing Log, if used, will clearly show the package is "Personal," including the inmate's name and a notation as to the amount of postage (in stamps) the inmate provided.   In the event of loss or damage, either the inmate (with staff assistance) or the recipient may make any claim relative to these mailings to the USPS.

b. **Contraband.**   Nuisance contraband that is to be mailed out, or personal property that must be sent out as a result of excessive accumulation, will be forwarded at the inmate's expense in accordance with the Program Statement **Inmate Personal Property**.

c. **International Mailing of Packages at Inmate's Expense.**   Inmates who desire to mail packages internationally must comply with both the USPS and the recipient country's rules. Mail room staff will help determine these rules.   If the material cannot meet the receiving country's specifications, mail room staff should consult with the Unit Manager and the inmate to obtain a domestic mailing address.   If unable to obtain the address and the inmate is not permitted to retain the property, it will be considered contraband and disposed of in accordance with the procedures in the Program Statement **Inmate Personal Property**.   These procedures **do not** apply to property temporarily stored for pretrial inmates.

d. **Outgoing Official Packages.**   Inmate packages forwarded as a matter of institution administration will be forwarded at government expense.   If the package is to be forwarded to another institution, a BP-A0383 will also be completed.

Packages forwarded between institutions will not be insured and will be forwarded via the current contract carrier.   Inmate personal property mailed home at government expense will also be sent via the current contract carrier.   Packages for transferred inmates will be shipped within 72 hours.   The logbook, or certified labels when used, will clearly reflect the package is "Official."

e. **International Mailing of Property Packages**.   Every attempt will be made to have the inmate provide a domestic mailing address for forwarding property packages.   When a package must be forwarded as international mail, mail room staff will consult with the local servicing post office to determine the rules required of the country to which the package is to be forwarded.

If the package cannot meet the requisite rules because it is official mail, the inmate will be given the opportunity to mail the material at his or her own expense (see Section entitled International Mailing of Packages at Inmate's Expense).

## 3.18    FORWARDING INMATE GENERAL MAIL

As stated previously, letter mail may not be opened until staff verify that an inmate is at the institution.   Unopened mail may be returned to the USPS in the original cover.   Regardless of the class of mail, if an inmate is not at the institution, an endorsement will be made on the envelope which provides a forwarding address or a notation of "Addressee Unknown – Return to Sender," and the mail returned to the post office.

Only the post office can determine whether a piece of mail will be forwarded.   Therefore, under its authority, the post office will forward or dispose of mail.   If it is required to forward a package, it will be resealed and forwarded at government expense.   If it is being returned to the

sender because a forwarding address is not available, this will be noted on the package, and it will be sealed and returned via the current contract carrier.   Receipts or other identifications attached to the original package will be retained with the documentation used to return the package.

USPS "Change of Address" kits will be available to each inmate at the designated institution to which they are transferred so they may notify correspondents of a change in address.   The kits will be obtained from the local servicing post office.   **Note:**   The "kit" is a USPS form notice to publishers, businesses, correspondents, etc., **not** to the Postmaster (of old address).

The USPS provides the kit for free.   The inmate will place postage on each notice used. Although it is the Bureau's responsibility to have the kits available, it is the inmate's responsibility to use these kits.   Inmates will be informed that the Bureau will forward mail for only 30 days and using the kits assures that mail is directed to the correct location after the 30-day forwarding period expires.

Inmate general mail (as opposed to special mail) will be forwarded to the new address in the SENTRY database for a period of 30 days.   General mail is not forwarded for holdover inmates when removed, nor is general mail forwarded to a holdover institution.   After the 30-day period, general mail received will be returned to the sender with the notation "Not at this Address — Return to Sender."   After 30 days, the SENTRY address will be used to forward special mail.

General mail for inmates released on writ will be processed as directed by the inmate on the Disposition of General Correspondence While Inmate is Released Temporarily on Writ form (BP-A0398).

**Chapter 4.   Special Postal Services**

**4.1   CASH ON DELIVERY (COD) SERVICES.**

COD services are not available for staff or inmate mail.   The mail room staff will refuse call slips or mail provided by USPS for COD materials in writing, or as required by the servicing local post office.

**4.2   POSTAGE DUE MAIL**

Postage due mail service is not available for staff or inmates.   It is the mailer's responsibility to provide correct postage.   The mail officer will refuse postage due mail.   However, if postage due mail is tendered to the mail room staff without collection of postage due, the mail will be processed without further collection action.

**4.3   EXPRESS MAIL SERVICE – STAFF OFFICIAL MAIL**

Staff at institutions and Regional Offices may use USPS Express Mail Service, if available, for official matters.   Contact your local USPS facility about availability.   The least expensive service that meets our needs will be used.   When used, the account number "137" - Bureau of Prisons or "132" - UNICOR, will be inserted in the "Customer Account" box.

The Mail and Reproduction Supervisor in the Central Office will place account numbers on receipts for the Central Office.   The receipt will have:

- The name of the mailer.
- The mailer's initials.
- The initials of the department head authorizing the service.

After delivery of the material to the post office, the mail room staff will forward the original receipt to the Central Office Mail and Reproduction Supervisor.   The receipts will be collected and forwarded quarterly.

The USPS Express Mail Service will only be processed through the official institution mail room to the local servicing post office.   For example, staff may not take USPS express mail to a post office near their home for convenience.

The Central Office funds system-wide Express Mail, and the receipts are used at the Central Office to verify the USPS billing.   A photocopy of the receipt may be retained locally, as desired.   Copies will be used if the Express Mail bill is challenged or further information is sought, particularly when Express Mail charges result from locations other than the local servicing post office.

Use of private overnight carriers, such as Airborne Express, DHL, Federal Express, etc., is each institution's responsibility and will be controlled and funded locally. Private overnight carriers may be used when they are less expensive than the USPS.

## 4.4    REGISTERED MAIL – STAFF OFFICIAL MAIL

Any mail item forwarded at government expense will not be forwarded as registered mail. Receipts, when needed, will be obtained by certifying the item.

Mail room staff will sign for incoming registered mail addressed to staff at the post office. Prior to delivery, mail room staff will enter the registry information in a log and obtain a signature from the recipient.

## 4.5    REGISTERED MAIL – INMATE USE

Inmates may use registered mail services only at their expense and only if sufficient postage stamps are placed on the registered piece to cover the expense of all registered mail services. All incoming and outgoing registered mail will be logged in a log book separate from staff mail.

## 4.6    INSURED MAIL – INCOMING

Insured mail will be considered as accountable mail and will be logged. It will be received and processed as previously stated for package items, or as special or general inmate mail. Inmates will sign for it and note the condition of the insured material at the time of receipt. The inmate will be advised that the sender will be responsible for claims if necessary.

## 4.7    INSURED MAIL – OUTGOING

Staff mail is not forwarded as insured mail, since the government is self-indemnifying. If receipts are necessary, use certified mail. An inmate may insure personal packages (e.g., hobby craft) provided the inmate completes an appropriate BP-329 form and provides correct postage. Payment is made by applying stamps.

When completing the Request - Authorization to Mail Inmate Package Form (BP-329), the inmate will make a declaration of item value and may request postal insurance, which will be made in increments stated in the DMM. The BP-329 advises the inmate that the USPS will indemnify a package only for an item's **actual** value, regardless of declared value.

When the inmate is making a personal insured mailing, paying with stamps, and a "Return Receipt" is requested, the return receipt will show the inmate's name and number clearly. When received, the receipt will be provided to the inmate.

Inmate personal packages must be prepared securely to preclude, inasmuch as possible, breakage or damage to the item(s) being mailed.

## 4.8    CERTIFIED MAIL – STAFF OFFICIAL

a. **Incoming Mail.**   Official certified staff mail will not be intermingled with inmate certified mail.   The mail room staff will maintain a log to record delivery to staff, obtaining the signature of staff at the time of delivery.   If a "Return Receipt" (green card) has been attached, the mail room staff will sign the card as recipient.

b. **Outgoing Mail.**   Usually, certified mail will be restricted to those items requiring evidence of mailing (such as inmate case files, etc.).   Stub type receipts are used to certify mail.   Stub receipts will be returned to the originating office for filing and retention, and the originating office will produce the receipt if tracing action is necessary.   Staff must show the sending department clearly on the receipt so that delivery of the receipt back to that department can be made when it arrives (see Chapter 3, Inmate Packages).

## 4.9    CERTIFIED MAIL – INMATE USE

a. **Incoming Mail.**   Inmate certified mail will be rated either as general correspondence (opened and inspected) or special mail (opened in the inmate's presence), as previously stated.   If a "Return Receipt" has been attached, mail room staff will sign the receipt, which will be dispatched in the next regular mail.

Because judicial and legal notices are often sent to inmates by certified mail, actual delivery to the inmate must be documented, preserved, and readily accessible for future verification in court proceedings.   Consequently, the following specific procedures apply to delivery and forwarding of inmate certified mail.

b. **Incoming Certified Mail Log.**   Institution mail room staff must maintain an Incoming Certified Mail Log documenting all incoming inmate certified mail.   At a minimum, each log is to include the following information:

- Date/Time received by mail room.
- Certified Mail Number (the entire number must be recorded).
- Inmate Name and Register Number.
- Inmate location (e.g., housing unit).
- Sender's name and return address.
- Date delivered to unit staff or inmate.
- Inmate signature (or "Refused to Sign"). **Note:** If a unit log book is used, this section is not required in the mail room log book.   If an inmate signs this log, then the unit log is not needed.
- Unit staff signature, if applicable.

Mail room staff's retention of the Incoming Certified Mail Log is governed by Chapter 5 of this Manual.

c. **Unit Certified Mail Log.**   At institutions where unit team staff sign for all certified mail, a certified mail log to document receipt of certified mail will be maintained.   At a minimum the following information must be included:

- Date/time received by unit staff.
- Certified Mail Number (the entire number must be recorded).
- Inmate Name and Register Number.
- Inmate location (e.g., housing unit).
- Sender's name and return address.
- Date delivered to inmate.
- Inmate signature (or "Refused to Sign").
- Housing unit staff signature.

The Unit Certified Mail Log may be combined with the Legal Mail delivery log.   Unit staff will retire the log books to the mail room annually (calendar year).   The Unit Certified Mail/Legal Mail Log books will be transferred to the Federal Records Center (FRC) and retained for 11 years.

## 4.10    FORWARDING OR RETURNING INMATE CERTIFIED MAIL

Certified mail addressed to an inmate who is not at the institution is to be forwarded or returned to the sender if a forwarding address is not available.   When returning certified mail to the sender, an appropriate notation will be made on the original envelope to inform the sender why the mail was not delivered.

The certified mail will be placed in an institution envelope and re-certified.   An entry will be made in the mail room's incoming inmate certified mail log book indicating:

- The inmate's name.
- New certified number.
- The address to which the mail was forwarded.

When the certified mail is received at the new institution, the procedures outlined in Section 4.9.c will be followed.

Mail room staff will retire certified mail log books annually (calendar year).   The Inmate Certified Mail Log books will be transferred to the FRC and retained for 11 years.

**Outgoing Mail.**   Certified mail will be sent first class at inmate expense.   Inmates may request certified mail service provided they bear:

- The full expense of basic postage.
- The cost of certification.
- The cost of return receipts, if requested.

All costs are paid with postage stamps.   Inmates may determine the costs by reviewing the postal chart(s).

The piece of correspondence to be certified will be brought to the mail room staff fully prepared for mailing, with the appropriate postage stamps affixed.   Return receipts, if requested, may be obtained at this time from the mail room staff and will be completed, clearly showing the inmate's name and number.   (When the receipt is returned, it will be given to the inmate, not maintained in the mail room.)

## 4.11   BOX SERVICES

Establishment of additional boxes at the local servicing post office with specific intra-institution addresses (e.g., satellite camps, etc.) can greatly facilitate the sorting process and are encouraged. CMCs will consider overall volume and additional costs at the local servicing post office when establishing extra box services.

## 4.12   MAIL IMPRINTS

An imprint, when used, requires the payment of postage when material is entered into the USPS. The mail imprint authority for the Bureau is G-231 and for UNICOR G-175.   Only the Central Office will obtain and use the imprint.

## 4.13   UNITED PARCEL SERVICE (UPS)

The Tender Agreement requires the UPS to ensure all Bureau sites have access to UPS service, and that they establish mutually convenient pickup and delivery schedules (ordinarily Monday through Friday, excluding weekends and holidays).   Each Bureau location will initiate contact with its local UPS office to establish daily service.

Each Bureau location will use UPS ground service to transport all official packages.   The maximum package weight and size limitations are specified in the "Guide to UPS Services," available from the local UPS representative.

UPS will provide training to Bureau staff at each location regarding UPS procedures and package tracking capabilities.   Each institution will contact their local UPS office to establish a date for training.

Under normal circumstances, delivery of packages within the contiguous United States will occur within approximately 5 days or less.   The Bureau reserves the right to decline acceptance of a package without cost to the government when the package is not authorized in accordance with Bureau policy.

**Tracking and Logging.** The Bureau may use a UPS computerized logging/tracking system for shipping packages.   Institutions should contact their local UPS representative for information on the available systems.   UPS will assist the Bureau to process any claims for packages UPS transported and provide tracking and/or delivery information.

Additionally, UPS has internet tracking.   Should it be necessary to trace a package, telephonic contact may be made by Receiving and Discharge staff with the UPS Tracking Hotline at **800-742-5877**.   When confirmation of delivery documentation is necessary, a hard copy receipt will be requested, via phone or printed copy from the Internet.

For inmate packages shipped at government expense to locations other than Bureau institutions, the sending institution must annotate the UPS Shipping Record to request a Delivery Confirmation Response and Signature Required.   The Request-Specific Reply Address service (the sending institution address) will also be used for these mailings.

When these services are used, the UPS Delivery TRAC label will be placed on the package.   The local UPS representative must be advised during the account's initial activation that the Request-Specific Reply Address service will only be used when inmate packages are mailed at government expense to locations other than Bureau institutions.

All confirmation response documentation listed in this paragraph will be filed and retained.   A UPS daily shipping record will be maintained to track all incoming and outgoing inmate personal property and other official outgoing packages.   Correctional Systems staff must request from the local UPS office the "UPS Daily Pickup Shipping Record" for all outgoing packages and inmate personal property.   Inmate property will be logged into this record noting the following:

- Inmate Name and Register Number.
- Addressee.
- ZIP Code.
- Weight.

This record will be maintained on file for two years.   An optional UPS computer program is available to perform the above functions and is authorized for use.

## 4.14   UPS USE LIMITATIONS

UPS will not be used for overnight delivery.   Overnight services for staff official business small packages must be restricted to urgent and exceptional circumstances, as governed by a separate contract.

Pitney Bowes meter strips will not be used when using UPS.

The Bureau reserves the right to use other carriers when more cost-effective.

Inmate files will not be sent via UPS.

## 4.15   INTERNATIONAL AND TERRITORIAL SHIPMENT.

The Bureau will not use UPS to ship small packages and inmate personal property internationally or to U.S. territories.   All international and territorial shipments of small packages and inmate personal property should be shipped via the USPS.

## 4.16   CONTRACTOR

The following information is provided for procurement purposes.   A Tender Agreement has been negotiated between the Bureau and UPS for shipping small packages and inmate personal property.

> United Parcel Service (UPS)
> 316 Pennsylvania Ave. SE #500
> Washington DC   20003
> (202) 675-4225

## 4.17   ORDERING

Recognizing that individual institutions may have different local operating requirements, no specific ordering instructions are provided.   Each institution will develop local procedures for ordering that meet all applicable policy, procedures, terms, and conditions of the agreement.

## 4.18   REPORTING

Orders placed against this agreement will not be reported in the Federal Procurement Data System (FPDS) reports, regardless of dollar value.   The Central Office will collect and report expenditures against this contract.

## 4.19    PAYMENT

UPS will bill each ordering site directly on a weekly basis.   Billing will consist of a weekly service charge UPS assesses for pickup and delivery at each site each business day, plus charges for actual packages shipped.   Payments will be made within 30 days in accordance with the Prompt Payment Act.

Payments are to be made via Electronic Funds Transfer (EFT) (UPS banking information to accomplish for EFT payment will be distributed separately).   Financial Management should ensure each payment is identified with the site's UPS "Shipper" account code, the invoice number, and UPS "Period Ending" date supplied on each invoice.

All packages mailed via UPS will be annotated in a "UPS Pickup Record."    The CMC will maintain this log or print the reports from the UPS package system and provide it to Financial Management each week for verifying the weekly billings.   Institutions must use the proper cost center code when recording billing information.

**Chapter 5.   Miscellaneous Administration**

## 5.1   SPECIAL UNITS

Local procedures will be developed to handle mail for special units (e.g., protective custody units).   The general principles for processing mail into and out of the USPS will be followed; however, within the institution, mail for these units will be handled in a manner that will not disclose names, register numbers, or locations related to these inmates.   These procedures may be entirely independent of the procedures outlined herein.

## 5.2   RECORDS

Postal related records will be retained in accordance with the General Records Schedules, Schedule 12.   The disposal periods provided are mandatory, except as indicated herein.   Postal related records may not be retained beyond the period specified, except for the Incoming Certified Mail Log and the Unit Certified Mail Log, all of which must be maintained for 11 years in accordance with Retention Authority N1-129-00-30, listed in the Records and Information Disposal Schedule (RIDS) on Sallyport.

Collateral records and forms filed in Inmate Central Files are not considered postal records, but are records to be retained until the Inmate Central File is destroyed.

## 5.3   FORMS

All forms prescribed in this Manual are available through regular forms ordering procedures. All forms except BP-329 are also available in the Forms Directory on Sallyport.

| | |
|---|---|
| BP-A0327 | Returned Correspondence |
| BP-A0328 | Stamps, Negotiable Instrument and Other Returned to Sender |
| BP-329 | Authorization to Mail Package |
| BP-A0331 | Authorization to Receive Package or Property |
| BP-A0383 | Inmate Personal Property Record |
| BP-A0398 | Disposition of General Correspondence While Inmate is Released Temporarily on Writ |
| BP-A0407 | Acknowledgment of Inmate, Part 1 & 2 |
| BP-A0408 | Acknowledgment of Inmate, Part 3 & 4 |
| BP-A0493 | Special Mail Notice |

## 5.4   TORT CLAIMS BY INMATES FOR MAIL MATTERS

The Bureau does not insure inmate property when forwarded as matters of institution administration because these articles are forwarded as official mail (see Chapter 3).   If property

is damaged while in Bureau control, the inmate will be instructed to file a tort claim.   (See the Program Statement **Federal Tort Claims Act.**)

If documentation clearly indicates that a package left Bureau control and the item was thereafter lost or damaged by the USPS in the mail process, the inmate will be instructed to file a claim with the USPS.

It is permissible for an inmate to insure an official mailing, provided the inmate pays for all costs associated with the mailing (postage and insurance fees).   This will be an entirely voluntary option and the inmate would have to be informed that the nature of the mailing changes from one of government responsibility to one of personal responsibility, including follow-up and filing of claims against the USPS.

## 5.5    INMATE CLAIMS TO THE USPS

Section 5.4 does not apply when inmates forward mail using postage stamps and pay for special services, such as insurance or certification.   Then, the inmate or the recipient files the claim with the USPS.

If an inmate elects to file a claim with the USPS, the mail room staff will contact the local servicing post office to obtain the appropriate USPS claim forms for the inmate.

## 5.6    INMATE CLAIMS TO UNITED PARCEL SERVICE (UPS)

When filing a claim with UPS, the shipping institution must:

- ■  Contact UPS Customer Service at **1-800-742-5877.**
- ■  Obtain appropriate claim number.

## **CERTIFICATE OF COMPLIANCE PURSUANT TO LOCAL RULE 7.1(C)**

I, Elena L. Cohen, certify that Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss, dated September 3, 2025 complies with the requirements of Local Rule 7.1(c), in that it contains 5,486 words.

Dated: September 3, 2025
      Brooklyn, New York

/s                     

Co-counsel for Plaintiff